CHOCTAW GENERATION LIMITED
PARTNERSHIP, Plaintiff–
Appellee,

v.

AMERICAN HOME ASSURANCE
COMPANY, Defendant–
Appellant.

Docket No. 01–7899.

United States Court of Appeals,
Second Circuit.

Argued Sept. 20, 2001.

Decided Nov. 16, 2001.

Jeffrey Gilmore, Wickwire Gavin, P.C., Vienna, VA, Cowan, Liebowitz & Latman, P.C., (Michael F. Maschio and Susan Schick, on the brief), for Plaintiff–Appellee.

Mark Friedman, Debevoise & Plimpton, New York, N.Y. (David W. Rivkin and Mark W. Friedman, on the brief), for Defendant–Appellant.

Before: FEINBERG, JACOBS, and CABRANES, Circuit Judges.

JACOBS, Circuit Judge.

The expedited appeal in this diversity case concerns an $81 million surety bond issued by defendant-appellant American Home Assurance Co. ("American Home") to secure performance under a construction contract pursuant to which (non-party) Bechtel Power Co. ("Bechtel") is building an innovative power-generation facility for the owner, plaintiff-appellee Choctaw Generation Limited Partnership ("Choctaw"). Provisional acceptance of the power-generation facility has been long delayed for reasons that are the subject of a good faith dispute: Bechtel attributes the delay to *force majeure;* Choctaw disagrees, and is claiming liquidated damages in an ongoing arbitration proceeding with Bechtel pursuant to the arbitration clause of the construction contract. To obtain payment of the liquidated damages pending the outcome of the arbitration, Choctaw drew down in full a $33 million letter of credit that the construction contract required Bechtel to post. The present dispute has to do with Choctaw's demand—arguably pursuant to a provision of the construction contract—that American Home as surety replenish the letter of credit as necessary until the full $81 million is drawn down to fund the rapidly accruing liquidated damages.

After the $33 million was drawn down and Choctaw's replenishment demand was made and rejected by American Home,

Choctaw commenced this action seeking a preliminary injunction to compel serial replenishment of the letter of credit by American Home. The United States District Court for the Southern District of New York (Cote, J .), acting with extraordinary expedition and thoroughness, conducted a hearing and issued a seventy page ruling from the bench. The district court:

(A) Mandated that American Home replenish the letter of credit on the ground (in a nutshell) that the construction contract required replenishment by the surety notwithstanding the existence of a good faith dispute between builder and owner concerning whether liquidated damages are payable;

(B) Refused to order Choctaw to arbitrate its surety dispute with American Home, on the ground that the surety contract signed by American Home does not contain an arbitration clause and that American Home did not sign the construction contract (which does); and

(C) Denied a stay.

After a panel of this Court likewise denied American Home's motion for a stay, Bechtel as principal replenished the letter of credit.

As of the date of oral argument, almost all of the $81 million had been drawn down, and it was anticipated that the whole $81 million would be drawn down shortly. This expedited appeal, however, is saved from mootness by the availability of an order directing that Choctaw make repayment, which would affect American Home's rights and duties as surety.

Among the defenses to this action asserted by American Home is that the present dispute is subject to arbitration. The surety contract contains no arbitration clause; so the decisive question on this appeal is whether surety American Home can compel Choctaw to arbitrate the present controversy over the surety contract under or by virtue of the arbitration clause of the construction contract to which Choctaw is a signatory and American Home is not. We conclude that this controversy is arbitrable because Choctaw agreed that controversies that are unable to be resolved pursuant to the construction contract "shall be settled by arbitration," and because (under our case law) Choctaw, as signatory, is estopped from avoiding arbitration with a non-signatory "when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." *Smith/Enron Cogeneration Ltd. Partnership, Inc. v. Smith Cogeneration Int'l, Inc.,* 198 F.3d 88, 98 (2d Cir.1999); *Thomson–CSF, S.A. v. American Arbitration Ass'n,* 64 F.3d 773, 779 (2d Cir.1995). We further conclude that arbitration is not foreclosed by a term of the construction contract that allows the remedy of specific performance, and reject Choctaw's argument that this term authorizes it to seek specific remedies in court notwithstanding the arbitration clause.

We therefore do not reach the many substantive and procedural issues addressed in the district court's careful and comprehensive opinion. We vacate that judgment solely to clear the way for rulings on the merits in arbitration, and we remand for the framing of an order directing arbitration.

## I

Bechtel and Choctaw entered into a series of contracts, dated June 30, 1998 (referred to collectively hereinafter as the "Construction Contract"), under which Bechtel agreed to provide engineering, procurement and construction services to Choctaw. In certain stated respects, Bechtel's performance under the Construc-

tion Contract was secured by a Performance and Payment Bond ("Bond") issued by American Home. The Bond contains no arbitration clause, but the Construction Contract, which does, is "referred to" in the Bond "and made a part" of the Bond "as if fully set forth" therein. The arbitration clause in the Construction Contract provides in Article 17.1 that "[i]f any dispute arises on matters concerning this Contract, either Party may initiate the dispute resolution procedures of this Article 17" by notice. The word "Party" is a defined term that includes only Choctaw and Bechtel. The Article 17 dispute-resolution procedures provide that disputes that remain unresolved after mandatory negotiations are to be resolved by binding arbitration subject to the construction industry rules of the American Arbitration Association ("AAA"), with each Party selecting one arbitrator and the third selected by the two (or if necessary, in accordance with procedures of the AAA). The procedural wording is set forth in the margin.[1]

There are other provisions of the Construction Contract in dispute between and among the parties, and there are disputes concerning the structure and architecture of the Construction Contract as a whole that may bear upon the merits of these controversies.

## II

American Home argued in the district court that Choctaw's claims against it were subject to arbitration on two theories: (A) under the Bond, because the Bond incorporates by reference the terms of the Construction Contract, including the arbitration clause; and (B) under the Construction Contract, because Choctaw as signatory is estopped from avoiding arbitration of a dispute with a non-signatory (such as American Home) where the non-signatory has a close relationship with the parties bound to arbitrate, where the dispute concerns that relationship, and where the dispute is closely linked to a dispute that is subject to arbitration in the underlying contract. Appellant's Brief at 51–56.

As to Choctaw's duty to arbitrate (A) under the Bond, the district court ruled that, "[e]ven as incorporated into the [B]ond, the contract's arbitration clause still pertains solely to disputes between Choctaw and Bechtel" because the contract wording compels arbitration only between the "Parties," a contractually de-

---

1. **17.2.** If the Parties are unable to resolve a dispute pursuant to Section 17.1, such dispute shall be settled by arbitration and any award issued pursuant to such arbitration may be enforced in any court of competent jurisdiction. Either Party may commence arbitration by serving written notice thereof on the other Party, which Notice shall designate the issues to be arbitrated, the specific provisions of this Contract under which such issues arose, such Party's proposed resolution of such issues and the maximum amount of damages sought by the Party. The arbitration will be conducted by a panel of three arbitrators. One arbitrator will be selected by Owner and one arbitrator will be selected by Contractor. The two arbitrators shall meet for the purpose of jointly selecting the third arbitrator within ten (10) Days after the date of such Notice. If the third arbitrator has not been selected within twenty (20) Days of the date of such Notice, then the third arbitrator shall be selected in accordance with the procedures of the American Arbitration Association. Any such arbitration shall be conducted in accordance with the construction industry rules of the American Arbitration Association in effect on the date of such notice other than as specifically modified herein. The arbitrators shall be bound by the provisions of this Contract, where applicable, and shall have no authority to modify such provisions in any manner. The decision of the arbitrators shall be final and binding upon both Parties, and a Party may have any court having jurisdiction over the Parties enter judgment in accordance with the arbitrators' award.

fined term that does not include American Home. We do not review Judge Cote's conclusion on this point, because we decide this appeal on the ground that arbitration is mandated under (B) the alternative theory of arbitrability pressed by American Home.

### III

As to Choctaw's obligation to arbitrate with American Home under the Construction Contract, the district court ruled that "a party [such as Choctaw] cannot be estopped from denying the existence of an arbitration clause to which it is a signatory where no such clause exists." This sound observation seemingly misapprehends the precise argument advanced by American Home.

In *Thomson–CSF*, 64 F.3d at 776–79, this Court classified five theories, including estoppel, under which a signatory can compel a non-signatory to arbitrate—none of them applicable here because among other things in this case it is the non-signatory that seeks to invoke the arbitration clause. As *Thomson–CSF* added, however, "[s]everal courts of appeal have recognized an alternative estoppel theory requiring arbitration between a signatory and nonsignatory. [Citations omitted.]" 64 F.3d at 779. Those courts looked to the relationships of persons, wrongs and issues, in particular whether the claims that the non-signatory sought to arbitrate were " ' "intimately founded in and intertwined with the underlying contract obligations." ' " 64 F.3d at 779 (quoting *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753, 757 (11th Cir.1993); *McBro Planning & Dev. Co. v. Triangle Elec. Constr. Co.*, 741 F.2d 342, 344 (7th Cir.1984)). In this way, "the circuits have been willing to estop a *signatory* from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." *Id.* at 779. The fact scenario in *Thomson–CSF* offered no occasion to apply or reject this principle, because the claims in *Thomson–CSF* were not "integrally related to the contract containing the arbitration clause." *Id.*

In a later case, however, this Court did apply that reasoning to compel a party that signed a contract containing an arbitration clause to arbitrate with a non-signatory. Thus in *Smith/Enron*, 198 F.3d at 98, after reprising the analysis in *Thomson–CSF*, we carefully reviewed the relationship among the parties, the contracts they signed (or did not), and the issues that had arisen, to arrive at the conclusion that the controversy was arbitrable at the behest of the non-signatory. We think that the present controversy is of the kind that justified arbitration in *Smith/Enron*, but that such a conclusion requires careful justification.

### IV

The controversy between Choctaw and American Home under the Bond could hardly be more closely bound to the dispute now in arbitration between Choctaw and Bechtel under the Construction Contract. The surety contract incorporates by reference the underlying Construction Contract. And the present dispute concerns the duty to replenish a letter of credit maintained under the Construction Contract, and requires a ruling as to whether that duty is independent of certain others in the context of the Construction Contract as a whole.

The tight relatedness of the parties, contracts and controversies is easily demonstrated by a (necessarily tedious) review of the contract terms in dispute between and among the parties, and the parties' competing analyses of them. The under-

lying dispute between Bechtel and Choctaw—concerning Choctaw's entitlement to liquidated damages—is now in the early stages of arbitration, and entails the construing of a dozen provisions of the Construction Contract. The immediate dispute in this action between Choctaw and American Home—concerning whether Choctaw can compel immediate replenishment of the letter of credit to fund the liquidated damages—turns upon many of the same provisions. The disputed provisions of the construction contract are set forth in the Appendix to this opinion.

The Construction Contract requires Bechtel to post a letter of credit, which Choctaw can draw upon for (among other things) liquidated damages (§ 13.9.2), and provides for initial funding, to be augmented over time, and to be replenished within 30 days of "any draw." § 13.9.1.

Choctaw concedes that a good faith dispute exists as to whether the delays in provisional acceptance of the power plant are attributable to force majeure, but argues that liquidated damages are accruing nevertheless. That is because the original contract date for provisional acceptance has passed, and though the contract gives Bechtel a right to tender a change order for more time, the contract provides that Choctaw has no "obligation to accept" the change order. § 14.2.

Having thus established to its satisfaction that liquidated damages are accruing, Choctaw invoked its contract right to draw on the letter of credit for payment (§ 13.9.2), Bechtel's contract obligation to replenish the letter of credit 30 days after it is drawn down (§ 21.2.9), and American Home's duty under the bond to replenish if Bechtel fails to do so. According to Choctaw, Bechtel is adequately and expressly protected because any draw thus made in error is subject to refund at a stipulated rate of interest. § 13.9.3. Thus, according

to Choctaw, the Bond operates (inter alia) to pay liquidated damages pendente lite in order to protect Choctaw's credit and cover its losses to suppliers and others, and does not depend on any ultimate determination concerning force majeure.

American Home's argument—and presumably Bechtel's position in the arbitration—is that since Choctaw and Bechtel have stipulated that there is a bona fide dispute as to whether the delay in provisional acceptance is being caused by force majeure, there is no duty to replenish the letter of credit. The sections of the Construction Contract that American Home invokes provide (A) that to the extent delay is caused by force majeure, Bechtel shall give Choctaw written notice of the onset date, and "[t]he Project Schedule shall be extended on a Day-for-day basis ...," (§ 14.3 .2); and (B) that Bechtel's unremedied failure to pay required payments is an event of default only if such payments are not the subject of a good faith dispute pursuant to the arbitration clause. § 21.2.8. In short, it is American Home's (and presumably Bechtel's) position that Choctaw's drawing down of the letter of credit was an act in breach of the Construction Contract; that the draw down therefore can trigger no enforceable contract right to replenishment that would merely facilitate Choctaw's further breaches; and that the approximately $80 million already drawn down should be promptly refunded with interest.

In short, the controversy presented on this appeal is linked textually to the Construction Contract, and its merits are bound up with the dispute now being arbitrated between Choctaw and Bechtel. Moreover, as a result of the district court's injunction, and this Court's refusal to stay it, replenishment has already occurred in whole or in overwhelming part. The bone of contention now has become whether

Choctaw should return funds it has drawn down with interest, as provided in Section 13.9.3 of the Construction Contract. Additionally, Bechtel elected to fund the replenishment itself as principal rather than allow American Home to do so in compliance with the district court's injunction.

So the present controversy over who shall hold funds is essentially an aspect of the same controversy now in arbitration between the two signatories to the Construction Contract. Because the operation of the injunction has altered matters in such a way as to reinforce and draw closer the linkage between the litigated controversy and the Construction Contract, we need not decide whether the district court erred in refusing to order arbitration; it is enough for us to rule that an order of arbitration is now clearly appropriate.

### V

Choctaw argued in the district court that its claim in this suit—American Home's specific performance of a duty to replenish the letter of credit if Bechtel defaults on its duty to do so—is in any event not arbitrable because Section 21.4 of the Construction Contract provides that in the event of a breach, "the non-defaulting party, at its discretion, may take one or more of the following actions":

21.4.1  proceed against the defaulting party pursuant to Article 17 [the arbitration clause];

21.4.2  *seek specific performance* of the defaulting Party's obligations under this Contract to the extent permitted by Law; or

21.4.3  terminate this Contract.

(Emphasis added.)

Choctaw argues that this wording allows it to elect specific performance in a court of law, and breaks any linkage between the dispute on appeal and its contract obli-

gation to arbitrate. The district court agreed, reasoning that there would be no point to Section 21.4.2 if all it did was single out one form of relief that would in any event be available in arbitration.

American Home demonstrates that there is good reason for Section 21.4.2 within the context of arbitration: to assure that specific performance is a remedy available to the arbitrators. Article 17 provides that "[a]rbitration shall be conducted in accordance with the construction industry rules of the American Arbitration Association ... other than as specifically modified herein." § 17.2. Those rules in turn empower the arbitral panel to "grant any remedy or relief deemed just and equitable *and within the scope of the agreement of the parties,* including but not limited to, equitable relief and *specific performance.*" Rule 46 (emphasis added). Choctaw reads Rule 46 to say that specific performance is a remedy already expressly granted; but we think that prudent lawyers could read Rule 46 as uncertain on this point, and in need of unambiguous contractual reenforcement.

In any event, the district court's reading would seem to place beyond the scope of arbitration the election by a party asserting default to terminate the contract altogether, a reading that essentially nullifies the otherwise broad gauge and detailed arbitration clause. We thus conclude that Section 21.4 is not an obstacle to arbitration in this case. Presumably, that is something for the arbitrators to determine if it is found to bear on the controversy.

Finally, Choctaw argues that the provisions of the Construction Contract cannot mitigate American Home's obligation to replenish because the Construction Contract provides that it is not for the benefit of any third party. The meaning and effect of that provision (§ 26.7) as well we leave to the arbitrators, except to observe

that the Bond incorporates the Construction Contract by reference.

## Conclusion

Insofar as the injunction has not been fully performed, it is vacated. This case is remanded to the district court for the crafting and entry of an order compelling arbitration. Because arbitration proceedings are already under way between Choctaw and Bechtel under Article 17 of the Construction Contract, and because it may be the feasible and stipulated wish of the parties that the dispute concerning the Bond be consolidated with that arbitration, we remand for the district court to enter an order directing arbitration on appropriate terms. Nothing in this opinion should be read to discourage the arbitrator or arbitrators from expediting consideration of questions concerning the surety bond. In order to assure that the proceedings in federal court do not unduly affect the consideration of the issues in arbitration, the district court's judgment is vacated.

## *APPENDIX*

### (Disputed Provisions of the Construction Contract)

13.9.1. *Amount of Contractor Letter of Credit.* On or before the Effective Date, Contractor shall provide to Owner the initial Contractor Letter of Credit in an amount equal to ten (10%) of the estimated payments to be made to Contractor in the first three months after the Effective Date. Thereafter, every three (3) Months, the amount of the Letter of Credit shall be increased by ten (10%) of the aggregate amounts of the projected Applications for Payment submitted by Contractor during such preceding period. The Contractor Letter of Credit shall have a term of twelve (12) Months, and not less than ten (10) Days prior to the expiration of the then

current Contractor Letter of Credit, Contractor shall provide a replacement Contractor Letter of Credit with a term of twelve (12) Months. Within (30) Days of any draw upon the Contractor Letter of Credit by Owner, Contractor shall reinstate the amount of the Contractor Letter of Credit to the full amounts required by the provisions of this Section 13.9.1.

13.9.2. *Draws Upon Contract Letter of Credit.* In the event that the Contractor fails to pay liquidated damages pursuant to Article 23 of this Contract within 30 days of Notice from Owner, then Owner, upon notice and a 30 day opportunity to remedy such failure, shall be entitled to draw upon the Contractor Letter of Credit for the amount due by Contractor. In addition, Owner shall be entitled to collect the full available amount under the Contractor Letter of Credit if Contractor has failed to deliver to Owner a replacement Contractor Letter of Credit not less than ten (10) Days prior to the expiration of the then current Contractor Letter of Credit.

13.9.3. *Erroneous Draws.* In the event that Owner draws upon any Contract Letter of Credit and it is subsequently determined that Owner was not entitled to all or any portion of the draw, then Owner shall repay to Contractor the amount of any such incorrect draw, plus simple interest, from the date of Owner's draw, at the Prime Interest Rate on the date of delinquency plus two percent (2%) per annum.

13.9.4. *Release of Letter of Credit.* Upon Project Completion, Owner shall draw upon the Contractor Letter of Credit for any liquidated damages due and not otherwise paid by the Contractor and return the Letter of Credit to Contractor if it has not been fully drawn down.

14.3 *Change Order for Delays.* If a delay or suspension of Work or activities identified on the Project Schedule occurs, an appropriate Change Order will be made to adjust the Project Schedule and the Contract Price as specified below:

14.3.1. To the extent the delay or suspension on activities is caused by Owner, the Project Schedule shall be extended on a Day–for–Day basis and the Contract Price shall be adjusted in an amount necessary to compensate Contractor for all direct and indirect costs and expenses on the basis set forth in Section 14.6 resulting from such delay or suspension ("Contractor's Delay Costs").

14.3.2. To the extent the delay or suspension on critical path activities is caused by Force Majeure, as that term is defined in Article 25 (excerpting therefrom for purposes of this Section 14.3.2. acts of Owner), Contractor shall give Owner written notice specifying the date of commencement of such delay or suspension within seven (7) days after the date on which Contractor first becomes aware of the event or act constituting the Force Majeure. The Project Schedule shall be extended on a Day–for–Day basis from the Force Majeure Delay Date and the Contract Price may be adjusted in accordance with this Article 14.

14.4. *Change Order for Contractor Delay or Error.* To the extent the delay or suspension of the Work is caused by Contractor or any Subcontractor or Vendor, no adjustment will be made to the Contract Price or Project Schedule, and Owner shall have the right to obligate Contractor to propose a plan to perform the changed Work while minimizing schedule impact, which may include increasing manpower and extended work hours or extra shifts if required, for Contractor to meet the Required Project Completion Date. Excess costs for such work will be to Contractor's account. Further, no Change Order shall be issued and no adjustment of the Contract Price, or the Project Schedule shall be made in connection with any correction of errors, omissions, deficiencies, or improper or defective work on the part of Contractor or any Subcontractors or Vendors in the performance of the Work.

21.2. *Contractor Events of Default.* Any of the following shall constitute an "Event of Default" with respect to Contractor if not cured in all material respects within the applicable cure period provided herein . . . .

21.2.8. failure of Contractor to make to Owner, when due, any payment required under this Contract if that failure is not remedied on or before the thirtieth (30th) Day after Owner provides Notice to Contractor of such failure, provided, however, the provisions of this Section 21.2.8 shall not apply to payments that are the subject of a good faith dispute pursuant to Article 17;

21.2.9. failure to maintain the Contractor's Letter of Credit as required by this Contract;

21.4. *Remedies for Default.* If an Event of Default has occurred and cure efforts have not been initiated by the appropriate date, or such Event of Default shall not have been cured in all material respects at the conclusion of the applicable cure period, the non-defaulting party, at its discretion, may take one or more of the following actions:

21.4.1. proceed against the defaulting party pursuant to Article 17;

21.4.2. seek specific performance of the defaulting Party's obligations under this Contract to the extent permitted by Law; or

21.4.3. terminate this Contract.

25.6. *Force Majeure as a Change.* If the Parties experience a Force Majeure, the Contractor may make a claim for a Change pursuant to Article 14.

26.7. *Not for Benefit of Third Parties.* This Contract and each and every provision hereof and thereof is for the exclusive benefit of the Parties hereto and not for the benefit of any third party, provided that each provision requiring the consent, approval or satisfaction of the Lender is also for the benefit of the Lender.