**HG ESTATE, LLC, Plaintiff,**

v.

**CORPORACIÓN DURANGO, S.A. DE DE C.V., Defendant.**

No. 02 Civ. 10059(CSH).

United States District Court, S.D. New York.

July 21, 2003.

Stephanie Goldstein, Fried, Frank, Harris, Shriver & Jacobson, New York City, for HG Estate, LLC.

Faith E. Gay, Charles C. Kline, Marilyn G. Kohn, White & Case, LLP, Miami, FL, for Corporación Durango.

## MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge.

In this diversity action, plaintiff sues defendant to enforce three promissory notes defendant gave to plaintiff, as well as defendant's obligations to plaintiff under an indemnity agreement. These documents were generated by the sale of three businesses owned by plaintiff to a subsidiary of defendant.

The case is presently before the Court on the parties' cross-motions. Defendant moves for an order staying this action pending an arbitration proceeding it has begun against plaintiff. Plaintiff cross-moves to dismiss or stay that arbitration pending the resolution of this action.

## I. BACKGROUND

### A. History of the Transaction in Suit

In 1999 plaintiff Estate, LLC ("HG"), a Delaware limited liability company, owned and desired to sell three companies: Gilman Paper Company, which owned and operated a pulp and paper mill; Converting Corporation, which manufactured and sold paper by-products; and St. Mary's Railroad Corporation, which owned and operated a short line railroad (collectively the "Purchased Companies"). HG entered into a Stock Purchase Agreement ("SPA"), dated as of December 9, 1999, with Durango Paper Company, a Delaware corporation ("Durango USA") and a subsidiary of defendant Corporation Durango S.A. de C.V., a Mexican corporation ("Durango Mexico"). Pursuant to the SPA, Durango USA purchased all of HG's interests in the Purchased Companies.[1]

The SPA identified HG and St. Mary's Railroad Corporation collectively as the "Seller" and Durango USA as the "Buyer."[2] Section 13.4 of the SPA provides in part:

---

1. The SPA identified HG and St. Mary's Railroad Corporation, its wholly owned subsidiary, as the "Seller" and Durango USA as the "Buyer." The preamble to the SPA also identifies as a party the W.O. Corporation, a New York corporation which agreed to become the successor sponsor of certain benefit plans for employees of the Purchased Companies and to assume certain of the Purchased Companies' liabilities and obligations. St. Mary's Railroad and W.O. play no part in the disputes giving rise to the present motions, and will not be further referred to in this opinion.

2. The SPA also identifies as a party the W.O. Corporation, a New York corporation, whose sole contractual functions were to become the successor sponsor of certain benefit plans maintained for the benefit of employees of the Purchased Companies and to assume certain specified liabilities and obligations of those Companies. W.O. plays no part in the disputes giving rise to these motions.

Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto (whether by operation of Law or otherwise), *other than by Buyer to any of its affiliates,* without the prior written consent of the other parties.

(emphasis added).

Pursuant to the SPA, the purchase price was $119.5 million. Durango USA financed the purchase by payment of $92 million in cash and the issuance of a promissory note in the amount of $27.5 million. In addition, Durango USA borrowed $18.1 million from HG to finance certain capital expenditures at the paper mill. In exchange for those borrowed funds, Durango USA gave HG two promissory notes, in the amounts of $12.1 million and $6 million respectively. I will refer to these three promissory notes collectively as the "Original Notes."

Durango Mexico played a significant role in the acquisition by its subsidiary, Durango USA, of the Purchased Companies from HG. In a separate document, Durango Mexico guaranteed the performance of Durango USA's performance under the SPA (the "Guaranty"). Durango Mexico also guaranteed Durango USA's payment under the Original Notes. Finally, Durango Mexico agreed to indemnify HG from losses that HG might suffer arising out of certain leases and contracts to which Gilman Paper Company, one of the Purchased Companies, was a party (the "IA").[3] The IA's preamble recites that its execution "is a condition to the consummation of the transactions contemplated" in the SPA.

The SPA was dated "as of December 9, 1999." The Guaranty, the Original Notes, and the IA were all dated December 17,

1999. These documents are closely interrelated and together comprise the transaction by which title to the Purchased Companies passed from HG to Durango USA.

In the spring of 2002, Durango Mexico suggested to HG that Durango Mexico replace its Guaranty of the SPA and Durango USA's three promissory notes with new notes to be issued by Durango Mexico. HG agreed. Accordingly Durango Mexico issued to HG three promissory notes, all dated May 28, 2002, as follows: a note for $29,998,062.26 due on December 17, 2004; a note for $12.1 million due on December 17, 2002; and a note for $6 million due on April 1, 2003 (collectively the "New Notes"). Upon the issuance of those notes Durango Mexico's Guaranty of the SPA and the Original notes given by Durango USA were cancelled. The IA given by Durango Mexico to HG was not affected.

Durango Mexico contends on the present motions that "recently" Durango USA and Durango Mexico "became aware that in order to induce [Durango Mexico] and [Durango USA] to enter into the Stock Purchase Agreement and the related notes and guarantees, the Sellers grossly overstated the value of the assets and understated the operating expenses of the Purchased Companies," causing the Durango companies to incur losses and debt of approximately $100,000,000. Main Brief at 3. Durango USA assigned its resulting claims against HG to Durango Mexico in a written assignment dated September 30, 2002.

On November 8, 2002, Durango Mexico, as the assignee of Durango USA, filed a notice of claim against HG and St. Mary's Railroad with the American Arbitration

---

**3.** Durango Mexico's indemnification of HG is contained in a separate document captioned "Cross–Indemnification Agreement" because HG also agreed to indemnify Durango USA from losses arising out of certain specified contingencies. HG's indemnification obligation is not at issue in the case, and I will not refer to it further.

Association, Northeast Case Management Center (the "AAA"). Durango Mexico seeks to submit to arbitration its claims against HG for fraud in the inducement of the SPA. The AAA has designated the arbitration proceeding as Case No. 50–T–168–00581–02.

HG denies that it is required to arbitrate disputes with Durango Mexico. Durango Mexico having defaulted in payment on two of the New Notes, on December 19, 2002 HG filed a complaint in the captioned action against Durango Mexico. HG seeks in this action a judgment against Durango Mexico on the three New Notes in an amount, with accrued interest, of "at least $50.2 million";[4] an order directing Durango Mexico to indemnify HG under the IA in an amount of "at least $3 million"; and an order requiring Durango Mexico "to adjudicate its fraud claims in this Court as required by the Notes and staying the arbitration proceeding." Complaint at 8.

Durango Mexico now moves to stay HG's action in this Court pending the arbitration before the AAA of its fraud claims against HG. HG cross-moves to dismiss or stay the arbitration pending the litigation in this Court.

As the careful reader will have deduced, the documents generated by this transaction contain forum selection clauses. It is necessary to consider those provisions in detail before discussing the law that governs these motions.

### B. The Forum Selection Clauses

■ The SPA contains an arbitration clause. The New Notes and the IA contain New York forum selection clauses. I discuss all these provisions under the caption "Forum Selection Clauses" because, as the Second Circuit has observed, "an

arbitration clause is merely a specialized type of forum selection clause." *Roby v. Corporation of Lloyd's,* 996 F.2d 1353, 1363 n. 2 (2d Cir.1993).

The SPA provides in Section 13.6(b)(i):

Any dispute, controversy or claim arising out of, relating to, or in connection with, this contract, or the breach, termination or validity thereof, shall be finally settled by arbitration. The arbitration shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association in effect at the time of the arbitration, except as they may be modified herein or by mutual agreement of the parties. The seat of the arbitration shall be New York, New York, and it shall be conducted in the English language, provided that either party may submit testimony or documentary evidence in Spanish and shall, on the request of the other party, furnish a translation or interpretation into the other language of any such testimony or documentary evidence. Notwithstanding *Section 13.6(a),* the arbitration and this clause shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq.

Section 13.6(a) of the SPA, referred to in this arbitration clause, provides generally that the SPA is governed "by the internal laws of the State of New York."

Each of the three New Notes contain, at Section 5.2, a choice of law clause which reads in part:

*Governing Law and Jurisdiction.* This Note shall be deemed made and delivered and shall be construed in accordance with and governed by the laws of the State of New York, without giving effect to the conflicts of laws principles

---

**4.** HG says that Durango Mexico's default on two of the New Notes renders all three notes

payable.

thereof. The Company [Durango Mexico] hereby irrevocably submits to the non-exclusive jurisdiction of any United States Federal or New York State court sitting in Manhattan in the City of New York in any action or proceeding arising out or relating to this Note and the Company hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in any such court and irrevocably waives any objection it may now or hereafter have as to the venue of any such suit, action, or proceedings brought in such a court or that such court is an inconvenient forum.

Each of the three Original Notes contained identical choice of law clauses.

The IA contains at Section 5 a choice of law clause which reads in part:

This Agreement shall for all purposes be construed in accordance with and governed by the laws of the State of New York. The parties hereby irrevocably submit to the non-exclusive jurisdiction of any United States Federal or New York Court sitting in Manhattan in the City of New York in any action or proceeding arising out of or relating to this Agreement. Each party hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in any such court and irrevocably waives any objection it may now or hereafter have as to the venue of any such suit, action or proceeding brought in such a court or that such court is an inconvenient forum.

## II. DISCUSSION

### A. Preliminary Observations

By including in the bundle of interrelated documents comprising this transaction one forum selection clause providing for arbitration and others providing for litigation, the draftsmen sowed the seeds of controversy which, with these cross-motions, come to a poisoned fruition.

That state of affairs flows from Durango Mexico's claim that HG obtained by the SPA and its accompanying notes, guarantees and indemnity agreements by fraudulent inducement. HG argues in its briefs that Durango Mexico's fraudulent inducement claim is not viable. But that issue is not before me on these motions, which deal not with the merits of Durango Mexico's claim but with designating the forum in which those merits will be decided: arbitration before the AAA or litigation in this Court.

Conceptually, both fora are competent to decide the underlying issues. Durango Mexico seeks to use its fraudulent inducement claim as a sword in arbitration; but that claim would also serve as a shield in litigation, since a fraudulent inducement of the SPA, if proven, would presumably operate as an affirmative defense to HG's suit against Durango Mexico on the New Notes and the IA: planetary undertakings orbiting around the SPA sun.

■ While the briefs of counsel discuss a number of issues, the motions turn upon two questions: whether Durango Mexico has the right to compel HG to arbitrate the fraudulent inducement claim; and, if so, whether the arbitration forum selection clause trumps the litigation forum selection clauses, or vice-versa. Assuming that the first question is answered in the affirmative, the second question must be answered, it cannot be avoided, because the parties' positions are mutually exclusive. HG says accurately that if it is compelled to arbitrate Durango Mexico's fraudulent inducement claim, it will be deprived of the benefits of the litigation forum selection clauses in the New Notes and the IA Durango Mexico says with equal accuracy that if it is compelled to assert its fraudulent inducement claim as a defense to HG's suit on the New Notes and the IA, it will

be deprived of the benefit of the arbitration clause in the SPA.[5]

I will consider these two questions in turn.

### B. Whether Durango Mexico has the Right to Compel HG to Arbitrate Under the SPA

On this question, HG argues principally that Durango Mexico cannot enforce the SPA arbitration clause against it because Durango Mexico is not a signatory to that contract. While the briefs cite numerous cases from a number of jurisdictions, I conclude that HG's contention fails in the light of a line of Second Circuit cases including *Thomson–CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773 (2d Cir. 1995); *Smith/Enron Cogeneration Ltd. Partnership, Inc. v. Smith Cogeneration Intern., Inc.*, 198 F.3d 88 (2d Cir.1999); and *Choctaw Generation Ltd. Partnership v. American Home Assurance Co.*, 271 F.3d 403 (2d Cir.2001). These cases consider (a) the right of a signatory to an arbitration agreement to compel a non-signatory to arbitrate, or (b) the right of a non-signatory to compel a signatory to arbitrate.

Not surprisingly, the first of these two situations is the more common. *See Smith/Enron*, 198 F.3d at 97–98 ("The more typical case, as we have noted, arises when a signatory to an arbitration agreement seeks to bind a non-signatory to it."). The case at bar presents the second, and more unusual, scenario; but "even when a non-signatory seeks to compel arbitration with a signatory," the Second Circuit has repeatedly expressed a willingness "to estop a *signatory* from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." *Smith/Enron*, 198 F.3d at 98 (citing and quoting *Thomson–CSF*, 64 F.3d at 779) (emphasis in original). I conclude on the authority of the cited Second Circuit cases that, assuming *arguendo* that Durango Mexico should be viewed as a non-signatory to the SPA, HG is estopped from resisting arbitration.[6]

In *Smith/Enron*, two corporations, SCI and Enron, entered into a joint venture agreement in 1993 to construct, finance and manage a power plant in the Domini-

**5.** These deprivations would in all likelihood be inflicted because, under the law of this circuit, an arbitration award can form the basis for claim preclusion or issue preclusion in subsequent litigation, see *BBS Norwalk One, Inc. v. Raccolta, Inc.*, 117 F.3d 674, 677 (2d Cir.1997) (" '[R]es judicata and collateral estoppel apply to issues resolved by arbitration where there has been a final determination on the merits, notwithstanding a lack of confirmation of the award.' ") (quoting *Jacobson v. Fireman's Fund Ins. Co.*, 111 F.3d 261, 267 (2d Cir.1997)); and presumably arbitrators would give some preclusive effect to prior litigation results.

**6.** Durango Mexico argues that by reason of the SPA's provision entitling Durango USA (the "Buyer") to assign the SPA "to any of its Affiliates" without HG's prior written consent, combined with Durango USA's subse-

quent assignment of its claims under the SPA to Durango Mexico, Durango Mexico should be regarded as a signatory to the SPA, or at least the functional equivalent of a signatory. I need not decide that question because, for the reasons stated in text, HG is estopped from resisting arbitration with Durango Mexico even if the latter is not a signatory to the SPA. *See Smith/Enron*, 198 F.3d at 97 ("Even if we accept *arguendo* SCI's claim that the Enron petitioners are not signatories to the 1994 Agreement, that does not end the matter. In this circuit, we have repeatedly found that non-signatories to an arbitration agreement may nevertheless be bound according to ordinary principles of contract and agency," principles which include estoppel.). Moreover, as the cases discussed in text make clear, signatories as well as non-signatories may be estopped from resisting arbitration.

can Republic. Thereafter both corporations engaged in a series of assignments to their affiliates, and an amended agreement was executed in 1994, which was followed by a second series of corporate assignments. Both the 1993 and 1994 agreements contained a broad arbitration clause providing for the arbitration of "any dispute ... arising under or relating to any obligation or claimed obligations under the provisions of this Agreement." 198 F.3d at 90. The project encountered difficulties as the result of SCI's financial straits. An arbitration on a particular point at issue was held and the SCI interests lost. With SCI's financial condition continuing to erode, SCI filed suit in a Dominican court against all the Enron companies and affiliates, alleging that its agreements with Enron had been fraudulently induced. A number of Enron companies, named as defendants in SCI's Dominican action, petitioned this Court to compel SCI to arbitrate with them the claims SCI asserted in the Dominican action, and to enjoin SCI from prosecuting that action. SCI did not, and could not, deny that it was a signatory to the 1994 arbitration agreement, but it resisted arbitration on the ground, *inter alia*, that "because none of the [Enron] petitioners are currently signatories to the 1994 Agreement as a result of the various transactions outlined above, they no longer have the right to compel arbitration of disputes under the Agreement." *Id.* at 91. The district court rejected that contention, compelled SCI to arbitrate, and stayed the Dominican action.

The Second Circuit affirmed, holding *inter alia* that SCI was estopped from resisting the arbitration to which it had agreed in the underlying contracts. The court of appeals stressed that agreement on the part of SCI, stating at 198 F.3d at 97:

> [W]hile a court should be wary of imposing a contractual obligation to arbitrate on a non-contracting party, we do not face that concern here. SCI is the party

trying to escape its obligation to arbitrate, but it (and/or its affiliate SCD) was a signatory to all three arbitration Agreements with Enron—that is, the Project Agreement, the 1993 Agreement and, most importantly, the 1994 Agreement.

The Second Circuit then observed, "[i]t is clear that the Enron defendants in the Dominican Lawsuit are the ones entitled to relief, as the subject matter of that lawsuit arises under all the Agreements, particularly the 1994 Agreement," *id.* at 98; and so the case came within the rule previously quoted, that a signatory to an arbitration agreement may be estopped "from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." *Id.*

In the case at bar, HG plays the role of SCI in *Smith/Enron*, and the Second Circuit's criteria for estoppel are clearly met: Durango Mexico's claim that HG fraudulently induced the SPA, the issue Durango Mexico seeks to resolve in arbitration, is inextricably intertwined with the all the other issues between HG and Durango Mexico arising out of the New Notes and the IA.

To be sure, *Smith/Enron* turned upon a single contract, the 1994 joint venture agreement, while in the case at bar the New Notes and the IA are contracts existing separately (at least in the technical sense) from the SPA. But that is a distinction without a difference, as the Second Circuit's holding in *Choctaw*, 271 F.3d 403, makes plain.

There were two contracts involved in *Choctaw*: a construction contract pursuant which Bechtel Power Company was building a power-generation facility for the Choctaw Generation Limited Partnership; and a surety contract between Bechtel and American Home Assurance Co. to secure

Bechtel's performance under the construction contract. The construction contract between Choctaw and Bechtel contained a broad arbitration clause;[7] the surety contract between Bechtel and American Home did not provide for arbitration. The project was long delayed; Choctaw attributed the delay to Bechtel's breach of the construction contract, and Bechtel attributed it to *force majeure.* Choctaw and Bechtel submitted that dispute to an ongoing arbitration, in accordance with the arbitration clause in the construction contract. As Choctaw's claim against Bechtel for liquidated damages grew during the pendency of the arbitration, Choctaw commenced an action in the district court against American Home, seeking a preliminary injunction to compel serial replenishment by American Home of the letter of credit Bechtel had posted.

American Home argued in the district court that Choctaw's claim against it was subject to arbitration under the arbitration clause in the construction contract between Choctaw and Bechtel. The district court rejected that contention, and entered a ruling which, as paraphrased by the court of appeals,

> refused to order Choctaw to arbitrate its surety dispute with American home, on the ground that the surety contract signed by American Home does not contain an arbitration clause and that American Home did not sign the construction contract (which does).

271 F.3d at 404. The Second Circuit reversed and directed Choctaw to arbitrate its claim against American Home. The court of appeals' reasoning is so instructive for the case at bar that I quote it at some length:

The surety contract contains no arbitration clause; so the decisive question is whether surety American Home can compel Choctaw to arbitrate under or by virtue of the arbitration clause of the construction contract to which Choctaw is a signatory and American Home is not. We conclude that this controversy is arbitrable because Choctaw agreed that controversies that are unable to be resolved pursuant to construction contract "shall be settled by arbitration," and because (under our case law) Choctaw, as signatory, is estopped from avoiding arbitration with a non-signatory "when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed."

*Id.* at 404 (citing and quoting *Smith/Enron* and also citing *Thomson–CSF* ).

■ If *Smith/Enron* is not dispositive of the question of Durango Mexico's right to compel HG to arbitrate, *Choctaw* surely is. The Second Circuit's language in *Choctaw* describes with only minor transpositions the contracts in the case at bar. Thus the Second Circuit said in *Choctaw:*

> The controversy between Choctaw and American Home under the Bond could hardly be more closely bound to the dispute now in arbitration between Choctaw and Bechtel under the Construction Contract.

271 F.3d at 406. Transposed to the present case, that language would read:

> The controversy between HG and Durango Mexico under the New Notes and the IA could hardly be more closely bound to the dispute now in arbitration between HG and Durango USA[8] under the SPA.

---

**7.** The construction contract provided that "[i]f any dispute arises on matters concerning this contract," either party could initiate dispute resolution procedures which, if unsuccessful, led to arbitration. 271 F.3d at 405.

**8.** For purposes of this analysis, I disregard Durango USA's assignment of its claims under the SPA to Durango Mexico.

I am unable to discern any principled basis for distinguishing the Second Circuit's holding in *Choctaw* from the case at bar. Just as American Home would avoid liability to Choctaw under the surety contract if the arbitrators in the arbitration between Choctaw and Bechtel under the construction contract were persuaded that Bechtel had not breached that contract, so Durango Mexico would avoid liability to HG under the New Notes and the IA if the arbitrators in the SPA arbitration were persuaded that HG procured that contract (and its satellite undertakings) by fraudulent inducement.[9]

The briefs of counsel cite decisions from other circuits and from district courts (including an opinion of my own). I need not consider those cases in detail, because if Second Circuit authority dispositive of the point at issue exists I am bound to follow it; and, concluding without difficulty that such authority exists on the question of Durango Mexico's right to demand arbitration with HG, I hold that Durango Mexico has that entitlement.

## C. Primacy of the Forum Selection Clauses: Arbitration or Litigation?

The conclusion reached in Part II.B. that Mexico Durango may invoke against HG the arbitration clause in the SPA does not dispose of these cross-motions, because HG is indisputably entitled to invoke against Durango Mexico the forum selection clauses in the New Notes and the IA. As noted in Part II.A., as a practical matter one of these forum selection clauses must initially give way to the other; and the primacy of such clauses in such circumstances appears to be a question of first impression.

Both parties are able to summon public policy to their aid. Many cases hold that public policy favors the resolution of disputes by arbitration, an approval also finding expression in domestic statutes and international conventions. Many cases hold that litigation forum selection clauses are favored. The briefs of counsel follow predictable lines of emphasis. Durango Mexico's briefs discuss the arbitration clause in shouts and the litigation forum selection clauses in whispers; HG reverses those emphases.

I conclude that in determining the order in which the parties' disputes will be addressed, primacy should go to the arbitration clause in the SPA, for two reasons: one grounded in public policy, and the other in considerations of judicial economy.

■ First, a line of Supreme Court cases hold that arbitration clauses are favored by a public policy which finds legislative expression in the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.*, and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. §§ 201 *et seq. E.g., Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) (affirming an order requiring enforcement of an arbitration agreement and recognizing "a liberal federal policy favoring arbitration agreements...."). I think that the public policy favoring arbitration enjoys a greater degree of gravitas than judicial expressions approving of forum selection clauses

---

**9.** The parties do not debate the issue, but I note in passing that claims of fraud in the inducement are arbitrable under a broadly worded arbitration clause such as that contained in the SPA. *See ACE Capital Re Overseas Ltd. v. Central United Life Ins. Co.*, 307 F.3d 24, 29 (2d Cir.2002) ("It is well settled that a claim or defense of fraudulent inducement, when it challenges generally the enforceability of a contract containing an arbitration clause rather than specifically the arbitration clause itself, may be subject to arbitration.") (citation omitted).

for litigation. Moreover, section 3 of the Federal Arbitration Act, 9 U.S.C. § 3, mandates a stay of litigation if "the issue involved is referable to arbitration," and the New Notes and IA are sufficiently intertwined with the SPA to make issues arising out of them "referable to arbitration" as that phrase is used in section 3.

Second, and quite apart from the stay of litigation mandated by the Act, enforcing the arbitration agreement and staying the litigation pending arbitration is a more efficient way of resolving all the interrelated disputes between HG and Durango Mexico. One may expect that once the AAA sets its deservedly renowned machinery in motion, an award accepting or rejecting Durango Mexico's claim that the SPA was fraudulently induced will be reached sooner than litigating the claim as an affirmative defense to HG's suit on the New Notes and the IA, with the more extensive discovery available in litigation. Moreover, the preclusive effects of arbitration upon litigation are more certain than the reverse. If the arbitrators reject Durango Mexico's fraudulent inducement claim, it would appear that HG could with minimal additional effort or expense obtain summary judgment against Mexico Durango on the New Notes and partial summary judgment as to liability on the IA. Conversely, if the arbitrators reject the fraudulent inducement claim, it would appear that Mexico Durango could with minimal additional effort and expense obtain dismissal of HG's suit on the New Notes and the IA. This is a better way to resolve the issues than by litigation to the death (including the inevitable appeals), with a somewhat less certain preclusive effect upon the AAA arbitrators.

## III. CONCLUSION

For the foregoing reasons, the motion of defendant Corporación Durango S.A. de C.V. for an order staying the captioned action pending the arbitration proceeding between plaintiff and plaintiff HG Estate, LLC is granted. The Court makes that order pursuant to section 3 of the Federal Arbitration Act, 9 U.S.C. § 3.

Plaintiff is directed to proceed to arbitration with defendant forthwith, or in accordance with such schedule as the American Arbitration Association may direct in that proceeding bearing the Association's number 50–T–168–00581–02. The Court makes that order pursuant to section 4 of the Federal Arbitration Act, 9 U.S.C. § 4.[10]

The cross-motion of plaintiff HG Estate, LLC to dismiss or stay that arbitration proceeding is denied.

It is SO ORDERED.

---

**10.** The Federal Arbitration Act is implicated by the issues in this case, and Durango Mexico's motion falls within the purview of both section 3 (mandating a stay of litigation of arbitrable claims) and section 4, 9 U.S.C. § 4 (mandating an order compelling arbitration if a binding agreement to arbitrate has been proved). While the Act does not itself create subject matter jurisdiction in the Federal district courts, so that another source of jurisdiction must be identified, that requirement is satisfied in the case at bar because HG and Durango Mexico are of diverse citizenship, and the SPA and its attendant undertakings constitute "a transaction involving commerce," as that phrase is used in 9 U.S.C. § 2 and defined in 9 U.S.C. § 1.