**In re CURRENCY CONVERSION FEE ANTITRUST LITIGATION**

**This Document Relates to all Actions.**

**MDL No. 1409, M 21–95.**

United States District Court, S.D. New York.

March 9, 2005.

Merrill G. Davidoff, Edward W. Millstein, Berger & Montague, P.C., Philadelphia, PA, Bonny E. Sweeney, Christopher Burke, Lerach, Coughlin, Stoia, Geller, Rudman & Robbins, LLP, San Diego, CA, Dennis Stewart, Hulett, Harper, Stewart, San Diego, CA, for Plaintiffs.

Peter E. Greene, Mitchell Schwartz, Skadden, Arps, Slate, Meagher & Flom, LLP, New York, NY for J.P. Morgan Chase & Co., Chase Manhattan Bank USA, N.A., and The Chase Manhattan Bank.

Jay N. Fastow, Fiona Schaeffer, Weil, Gotshal Manges, LLP, New York, NY, for MasterCard International Corp.

Charles E. Buffon, Robert D. Wick, Covington & Burling, Washington, D.C. for Bank One Corp. and First USA Bank, N.A.

Brian P. Brosnahan, Heller, Ehrman, White & McAuliffe, LLP, San Francisco, CA, for Visa U.S.A., Inc.

Randall A. Hack, Lord, Bissell & Brook, LLP, Chicago, IL, for Visa International Service Association.

Theodore R. Scarborough, David F. Graham, Sidley, Austin, Brown & Wood, LLP, Chicago, IL, for Citigroup Inc., Citibank (South Dakota), N.A., Citibank (Nevada), N.A., Universal Financial Corp., Universal Bank, N.A., and Citigroup Diners Club, Inc.

Edward Rogers, Ballard, Spahr, Andrews & Ingersoll, LLP, Philadelphia, PA,

for Providian Financial Corp., Providian National Bank Inc. and Providian Bank.

George A. Cumming, Jr., Morgan, Lewis & Bockius, LLP, San Francisco, CA, for Household Credit Services, Inc.

Mark Ladner, William Wade-Grey, Morrison & Foerster, LLP, New York, NY, for Bank of America Corp. and Bank of America N.A. (USA).

Christopher Lipsett, Noah A. Levine, Wilmer, Cutler & Pickering, New York, NY, for MBNA Corporation and MBNA America Bank, N.A.

## MEMORANDUM AND ORDER

PAULEY, District Judge.

These class actions, consolidated for pretrial proceedings, assert violations of the Sherman Act, 15 U.S.C. § 1 *et seq.*, the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*, and the South Dakota Deceptive Trade Practices Act ("DTPA"), arising from an alleged price-fixing conspiracy among VISA, MasterCard and their member banks (collectively "defendants") concerning foreign currency conversion fees. Defendants move for reconsideration of this Court's October 15, 2004 Memorandum and Order on class certification. Defendants also move to stay this litigation pending arbitration. For the reasons set forth below, defendants' motions are granted in part and denied in part.

## BACKGROUND

The factual background underlying these actions are set forth in this Court's prior opinions, familiarity with which is presumed. *See In re Currency Conversion Fee Antitrust Litig.*, 224 F.R.D. 555 (S.D.N.Y.2004) ("*Currency Conversion II*"); *In re Currency Conversion Fee Antitrust Litig.*, 265 F.Supp.2d 385 (S.D.N.Y. 2003) ("*Currency Conversion I*"). The salient facts for these motions are summarized below.

VISA and MasterCard (collectively, the "network defendants") facilitate the purchase of goods and services in foreign countries in local currency. The purchase price is converted to U.S. dollars and then billed to the United States cardholder. *Currency Conversion II*, 224 F.R.D. at 559. As part of that process, cardholders are charged a currency conversion fee that ranges between one and three percent of the total cost of the purchase. *Currency Conversion II*, 224 F.R.D. at 559. Plaintiffs allege that these fees are assessed regardless of whether defendants convert or exchange the currency. *Currency Conversion II*, 224 F.R.D. at 559. VISA and MasterCard automatically impose this currency conversion fee on cardholders at the network level. *Currency Conversion II*, 224 F.R.D. at 559.

There are two tranches of currency conversion fees charged by VISA and MasterCard. The first tier is charged by either VISA or MasterCard at one percent of the purchase price and retained by the respective credit card association. *Currency Conversion II*, 224 F.R.D. at 560. The second tranche, typically two percent on top of the one percent fee, is retained by the cardholder's issuing bank. *Currency Conversion II*, 224 F.R.D. at 560.

It is undisputed that the credit card agreements of most class members now contain an arbitration agreement, requiring them to arbitrate against their issuing bank. Four card issuing banks—Bank of America, Bank One Delaware (f.k.a. First USA), Household and MBNA—amended their cardholder agreements to include arbitration agreements prior to the commencement of this litigation. (Plaintiffs' Consolidated Opposition to Defendants' Motions to Stay Litigation, dated Jan. 18,

2005 ("Pl.Mem.") at 2.) The other card issuing banks—Chase, Citibank, Diners Club[1] and Providian—similarly modified their cardholder agreements during the pendency of this litigation. (Pl. Mem. at 1 (citing to defendants' submissions).) By May 2002, all banks had incorporated arbitration clauses into their cardholder agreements. (Pl. Mem. at 13 n. 9.)

In its July 7, 2003 Memorandum and Order, this Court described the paradigm arbitration clause in cardholder agreements:

Arbitration: Any claim, dispute or controversy ("Claim") by either you or us against the other, or against the employees, agents or assigns of the other, arising from or relating in any way to this Agreement or your Account, including Claims regarding the applicability of this arbitration clause or the validity of the entire Agreement, shall be resolved by binding arbitration by the National Arbitration Forum, under the Code of Procedure in effect at the time the Claim is filed.... Any arbitration hearing at which you appear will take place at a location within the federal judicial district that includes your billing address at the time the Claim is filed. This arbitration agreement is made pursuant to a transaction involving interstate commerce, and shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1–16. Judgement upon any arbitration award may be entered in any court having jurisdiction.

This arbitration agreement applies to all Claims now in existence or that may arise in the future except for Claims by or against any unaffiliated third party to whom ownership of your Account may be assigned after default (unless that party elects to arbitrate). Nothing in this Agreement shall be construed to prevent any party's use of (or advancement of any Claims, defenses, or offsets in) bankruptcy or repossession, replevin, judicial foreclosure or any prejudgment or provisional remedy relating to any collateral, security or property interests for contractual debts now or hereafter owed by either party to the other under this Agreement.

IN THE ABSENCE OF THIS ARBITRATION AGREEMENT, YOU AND WE MAY OTHERWISE HAVE HAD A RIGHT OR OPPORTUNITY TO LITIGATE CLAIMS THROUGH A COURT, AND/OR TO PARTICIPATE OR BE REPRESENTED IN LITIGATION FILED IN COURT BY OTHERS, BUT EXCEPT AS OTHERWISE PROVIDED ABOVE, ALL CLAIMS MUST NOW BE RESOLVED THROUGH ARBITRATION.

*Currency Conversion I*, 265 F.Supp.2d at 398–99 (describing the First USA arbitration clause). All of the credit card issuing banks utilize similar arbitration clauses.[2]

---

**1.** Diners Club is listed as a separate defendant in this litigation. However, the Diners Club card is owned and operated by Citibank (South Dakota) N.A. (Second Consolidated Amended Class Action Complaint ("Compl.") ¶¶ 45–46, 121).

**2.** In its opinion on class certification, this Court noted that Providian's arbitration clause excluded cardholders' claims in lawsuits that were pending on the date of the mailed change of terms notice. *Currency Conversion II*, 224 F.R.D. at 569 n. 8 (citing the Declaration of Debra Martinez, dated Feb. 4, 2004, Ex. B: Providian's March 2001 notice of change of terms to cardholder agreement). Recently, Providian informed this Court that it sent out additional notices of change to its cardholders, disclosing that it had added arbitration clauses similar to those of the other issuing banks. (Declaration of Debra Martinez, dated Feb. 7, 2005 ¶¶ 7, 11–12, Ex. A: Cardholder Agreement sent to Providian's cardholders in July 2004, Ex. C: Notice of Change, dated Sept. 2001, Ex. D: Notice of Change, dated Jan. 2002.) Thus, Providian argues that the exclusionary language mentioned in this Court's earlier opin-

See, e.g., *Currency Conversion I*, 265 F.Supp.2d at 399–400. (*See also* Memorandum in Support of Chase's Motion for Stay of Litigation, dated Jan. 7, 2005 ("Chase Mem.") at 12 (discussing the Chase credit card agreement).)

### PROCEDURAL HISTORY

On March 21, 2002, defendants Bank One Delaware (f.k.a. First USA), Bank of America, MBNA and their respective parent corporations moved to refer the claims against them to arbitration. *See Currency Conversion I*, 265 F.Supp.2d at 397. At that time, plaintiffs conceded that no named plaintiff used an MBNA credit card for foreign purchases. *Currency Conversion I*, 265 F.Supp.2d at 398. Because there were no MBNA cardholder plaintiffs, this Court did not consider whether any MBNA cardholder's claims belonged in arbitration.[3] *Currency Conversion I*, 265 F.Supp.2d at 398. However, this Court reached that question with respect to the Bank One Delaware (f.k.a. First USA) and Bank of America cardholders' claims, and required those plaintiffs to proceed to arbitration. *Currency Conversion I*, 265 F.Supp.2d at 416.

On November 12, 2003, plaintiffs moved for class certification. In opposing the motion, defendants argued that "most putative class members voluntarily signed a binding arbitration agreement with their credit card issuers," and therefore were precluded from participating in this litigation. *Currency Conversion II*, 224 F.R.D. at 569. Consequently, defendants asked this Court to exclude cardholders who signed arbitration agreements from any certified class. This Court granted defendants' application in part and denied it in part:

> In sum, this Court holds that arbitration clauses engrafted on cardholder agreements after this litigation commenced are not enforceable. Conversely, the arbitration agreements entered into before this action are enforceable between the signatories.

*Currency Conversion II*, 224 F.R.D. at 570. Defendants further requested that those cardholders who agreed to arbitrate disputes with their own credit card issuers be estopped from litigating against other card issuing banks or the network defendants. *Currency Conversion II*, 224 F.R.D. at 570. The Court ruled that cardholders with enforceable arbitration clauses may bring antitrust claims against nonissuing defendant banks "because the nonissuing defendant banks were not parties to those agreements, and the contract provisions did not extend to them." *Currency Conversion II*, 224 F.R.D. at 570.

On November 3, 2004, defendants filed a joint motion for reconsideration. They argue, *inter alia*, that this Court should reconsider its decision not to apply the estoppel doctrine to claims against the nonsignatory issuing banks and the network defendants. (Defendants' Memorandum in Support of their Joint Motion for Reconsideration, dated Nov. 3, 2004 ("Def.Recon.Mem.") at 1–2.) Defendants also ask this Court to modify limited aspects of its ruling related to the scope and definition of the classes. (Def. Recon. Mem. at 2.)

In addition, defendants jointly moved to stay litigation pending arbitration, based

---

ion only applies to those cardholders who received the March 2001 notice of change, but did not receive any further change of terms notice. (Memorandum in Support of Providian's Motion for Stay of Litigation, dated Jan. 7, 2005 ("Providian Mem.") at 7–8.)

**3.** Similar to Bank One Delaware (f.k.a. First USA), Bank of America and MBNA, Household also added its arbitration clause prior to this litigation. Plaintiffs concede that Household did not waive its right to compel arbitration. (Letter to Court from Bonny E. Sweeney, dated Dec. 8, 2004.)

on estoppel principles, Federal Arbitration Act § 3, or this Court's inherent power to control its docket (Memorandum in Support of All Defendants' Joint Motion for a Stay Pending Arbitration, dated Jan. 7, 2005 ("Joint Memorandum" or "Joint Mem.")). Simultaneously, Chase, Citibank and Providian filed separate stay motions, arguing that their cardholder agreements contain valid arbitration clauses.

## DISCUSSION

### I. Motion for Reconsideration Standard

▆ A motion for reconsideration is an "extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources." *In re Health Mgmt. Sys., Inc. Sec. Litig.*, 113 F.Supp.2d 613, 614 (S.D.N.Y.2000) (internal quotation marks and citation omitted). For reconsideration, the movant must demonstrate that the Court overlooked controlling decisions or factual matters that were put before it on the underlying motion, which, had they been considered "might reasonably have altered the result reached by the court." *Consol. Gold Fields v. Anglo Am. Corp.*, 713 F.Supp. 1457, 1476 (S.D.N.Y.1989); *accord In re Initial Pub. Offering Antitrust Litig.*, Nos. 01 Civ.2014(WHP), 01 Civ. 11420(WHP), 2004 WL 789770, at *1 (S.D.N.Y. Apr. 13, 2004); *Dietrich v. Bauer*, 76 F.Supp.2d 312, 327 (S.D.N.Y. 1999); *Ameritrust Co. Nat'l Ass'n v. Dew*, 151 F.R.D. 237, 238 (S.D.N.Y.1993). Another "major ground[ ] justifying reconsideration [is] 'an intervening change of controlling law [or] the availability of new evidence.'" *Virgin Atl. Airways, Ltd. v. Nat'l. Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir.1992) (quoting 18B C. Wright, A. Miller & E. Cooper, Federal Practice &

Procedure § 4478 at 790); *accord United States v. Sanchez*, 35 F.3d 673, 677 (2d Cir.1994); *Caribbean Wholesales & Serv. Corp. v. U.S. JVC Corp.*, 101 F.Supp.2d 236, 239 (S.D.N.Y.2000) ("Because the law is constantly evolving, 'a new decision clarifying the applicable substantive law may justify reexamining a denial of summary judgment.'") (quoting *Lavespere v. Niagara Mach. & Tool Works*, 910 F.2d 167, 185 (5th Cir.1990)).

▆ Motions for reconsideration are governed by Local Civil Rule 6.3, which is "narrowly construed and strictly applied so as to avoid repetitive arguments on issues that have been considered fully by the court." *Dietrich*, 76 F.Supp.2d at 327. The purpose of Rule 6.3 is to "ensure the finality of decisions and to prevent the practice of a losing party examining a decision and then plugging the gaps of a lost motion with additional matters." *Carolco Pictures, Inc. v. Sirota*, 700 F.Supp. 169, 170 (S.D.N.Y.1988) (internal quotations and citations omitted). "The decision to grant or deny a motion for reconsideration is within the sound discretion of the district court." *Keiser v. CDC Inv. Mgmt. Corp.*, No. 99 Civ. 12101(WHP), 2004 WL 516212, at *1 (S.D.N.Y. Mar.17, 2004); *accord Dietrich*, 76 F.Supp.2d at 327.

### II. Plaintiffs' Failure to Name Class Representatives for Diners Club and Providian Cardholders

#### A. Diners Club

Defendants argue that no TILA subclass for Diners Club cardholders should be certified because no named plaintiff holds a Diners Club card. (Def. Recon. Mem. at 8; Defendants' Reply Memorandum in Support of their Joint Motion for Reconsideration, dated Dec. 1, 2004 ("Def.Recon.Reply") at 7.)[4]

---

4. Citibank also requests that this Court vacate the Citibank damages subclass in its entirety, because there cannot be any valid Diners Club class and also because this Court has

already found that a class based on claims stemming from the South Dakota Deceptive Trade Practices Act cannot be certified. (Def. Recon. Mem. at 9–10.) *See Currency Conver-*

■ Plaintiffs respond that Diners Club cardholders' claims are subsumed in the Citibank TILA subclass and that the absence of a Diners Club cardholder class representative is immaterial. (Pl. Recon. Opp. at 10 n. 11.) This Court disagrees. The Complaint makes different factual allegations against Diners Club and Citibank. (*Compare* Compl. ¶¶ 120–21 (noting that Diners Club only charges one tier of the currency conversion fee that it keeps entirely), *with* Compl. ¶ 100 (noting that Citibank charges two tiers of currency conversion fees, one for the network defendants and the other for itself).) Further, the Diners Club accounts were not part of the VISA or MasterCard networks, a fact that makes claims against it atypical of those against the other card issuing banks. Thus, this Court finds that the claims of the Diners Club cardholders are not subsumed in the Citibank TILA subclass. *See Marisol A. v. Giuliani*, No. 95 Civ. 10533(RJW), 1998 WL 199927, at *7–8 (S.D.N.Y. Apr.23, 1998) (stating that each subclass must independently satisfy the requirements of Rule 23, including the typicality requirement); *see also In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 291 (2d Cir.1992) (noting that the typicality requirement "is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability"); *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 562–63 (2d Cir.1968) (Rule 23(a)(4)'s second requirement, "that the interest of the representative be coextensive with the interest of the entire class ... amounts to little more than [a restatement of Rule 23(a)(3)'s

proscription] that the plaintiff's claim must be typical of those of the entire class...."); *Burka v. New York City Transit Auth.*, 110 F.R.D. 595, 602 (S.D.N.Y.1986) ("[C]lass treatment will be foreclosed if the representative's legal and factual positions are 'markedly different' from those of other class members, and when those differences go to the very subject matter of the litigation." (internal citations and quotations omitted)).

Plaintiffs' application to name a Diners Club cardholder class representative is denied because it would be prejudicial to defendants and spawn undue delay. Fact discovery has closed and the trial date looms.[5] *See Chavez v. Ill. State Police*, 251 F.3d 612, 632–33 (7th Cir.2001) (finding that district court did not abuse discretion by denying motion to replace class representative who had dropped out, because replacement would be prejudicial and require additional discovery); *Berns v. EMI Publ'g, Inc.*, No. 95 Civ. 8130(KTD), 1999 WL 1029711, at *5 (S.D.N.Y. Nov.12, 1999) ("Leave to amend is clearly inappropriate when Plaintiffs have had ample opportunity to allege an obvious claim sooner."). Because no named plaintiff is a Diners Club cardholder, this Court declines to certify any Diners Club subclass.

### B. *Providian*

■ Subsequent to this Court's Memorandum and Order on class certification, this Court granted plaintiffs' motion to dismiss seven named plaintiffs as class representatives. *In re Currency Conversion Fee Litig.*, No. MDL 1409, 2004 WL 2453927, at *1–2 (S.D.N.Y. Nov.3, 2004).

---

*sion II*, 224 F.R.D. at 570–71. Plaintiffs do not oppose this request. (Pl. Recon. Opp. at 10 n. 12.) Accordingly, this Court vacates the Citibank damages subclass in its entirety.

**5.** If the trial is postponed, this Court will entertain a motion to amend the Complaint to

add new plaintiffs or replace the withdrawn plaintiffs. *See, e.g., In re Initial Pub. Offering Sec. Litig.*, 224 F.R.D. 550, 551–52 (S.D.N.Y. 2004); *see also German v. Fed. Home Loan Mortg. Corp.*, 168 F.R.D. 145, 156 (S.D.N.Y. 1996).

As a result, no named plaintiff is a Providian cardholder. (Def. Recon. Mem. at 8; Pl. Recon. Opp. at 9–10; Compl. ¶¶ 44, 48, 52, 57, 62, 66, 69.) Therefore, defendants argue that this Court should deny a TILA subclass for Providian cardholders. (Def. Recon. Mem. at 8; Def. Recon. Reply at 5–6.) Plaintiffs counter by seeking permission to name a new class representative for the Providian TILA subclass. (Pl. Recon. Opp. at 9–10.) That application is denied. *See infra* Section II.A. Because no named plaintiff is a Providian cardholder, this Court declines to certify a Providian TILA subclass at this time. *See Berns,* 1999 WL 1029711, at *5; Fed.R.Civ.P. 23 (requiring a class representative).

### III. *Enforcement of Arbitration Clauses*

The Federal Arbitration Act ("FAA") governs written contracts concerning commercial transactions that contain an arbitration clause. 9 U.S.C. § 2; *see also Dluhos v. Strasberg,* 321 F.3d 365, 369 (3d Cir.2003) ("The Federal Arbitration Act explicitly permits the use of arbitration and specifically authorizes individuals in commercial transactions to contract for arbitration."). The FAA establishes a liberal policy in favor of arbitration as a means to reduce the expense and delay of litigation. *See Campaniello Imps., Ltd. v. Saporiti Italia S.p.A.,* 117 F.3d 655, 665 (2d Cir.1997) (Pollack J., by designation); *see also Oldroyd v. Elmira Sav. Bank, FSB,* 134 F.3d 72, 76 (2d Cir.1998) ("There is a strong federal policy favoring arbitration as an alternative means of dispute resolution."). As a result, arbitration clauses must be read as broadly as possible, and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983).

Arbitration is contractual in nature, and "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Techs., Inc. v. Communications Workers of Am.,* 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (quoting *United Steelworkers of Am. v. Warrior & Gulf,* 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)). Section 2 of the FAA provides that written agreements to arbitrate "shall be valid, irrevocable, and enforceable, save upon grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; *Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 218, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985); *see also Doctor's Assocs., Inc. v. Casarotto,* 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996) ("Thus, generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2."); *Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel,* 346 F.3d 360, 364–65 (2d Cir.2003). Arbitration agreements shall be enforced subject to all contractual defenses. 9 U.S.C. § 2. In evaluating the merit of those defenses, courts "should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chi., Inc. v. Kaplan,* 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). "Courts may not, however, invalidate arbitration agreements under state laws applicable *only* to arbitration provisions." *Doctor's Assocs.,* 517 U.S. at 687, 116 S.Ct. 1652. Indeed, in enacting Section 2 of the FAA, "Congress precluded [s]tates from singling out arbitration provisions for suspect status, requiring instead that such provisions be placed upon the same footing as other contracts." *Doctor's Assocs.,* 517 U.S. at 687, 116 S.Ct. 1652 (quotations omitted). "[T]he party resisting arbitration bears the burden of proving that the claims at issue

are unsuitable for arbitration." *Green Tree Fin. Corp.-Ala. v. Randolph,* 531 U.S. 79, 91, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000).

■ Section 3 of the FAA provides that the court must stay any suit or proceeding until arbitration has been completed if the action concerns "any issue referable to arbitration" under a written agreement. 9 U.S.C. § 3; *accord Dean Witter,* 470 U.S. at 218, 105 S.Ct. 1238; *McMahan Sec. Co. L.P. v. Forum Capital Mkts., L.P.,* 35 F.3d 82, 85 (2d Cir.1994). The FAA mandates that district courts direct the parties to proceed to arbitration on issues encompassed by the arbitration agreement. *See E.G.L. Gem Lab, Ltd. v. Gem Quality Inst., Inc.,* No. 97–7102(LAK), 1998 WL 314767, at *2 (S.D.N.Y. June 15, 1998). Here, there is no dispute that most plaintiffs' cardholder agreements contain an arbitration clause.

## IV. *Enforceability of Arbitration Agreements Reached after Commencement of this Litigation*

Defendants Chase and Citibank[6] engrafted arbitration clauses on their cardholder agreements after this litigation began. In all instances, the issuing banks added the arbitration clauses to the cardholder agreements by mailing a Change in Terms notice to their cardholders. (*See, e.g.,* Declaration of Susan Bridge, dated Feb. 18, 2004 ("Bridge Decl.") ¶ 9; Affidavit of Stephen J. Farrell, dated Jan. 5, 2005 ("Farrell Aff.") ¶ 3.) The notices provided that cardholders were agreeing to arbitrate their credit card disputes and forfeiting their right to bring a civil lawsuit against their card issuing bank. (*See, e.g.,* Bridge Decl. ¶¶ 9–11; Farrell Aff. ¶¶ 3–4.)

If cardholders disagreed with the changes described in the notice, they were obliged to inform their issuing bank. (*See, e.g.,* Bridge Decl. ¶ 12; Farrell Aff. ¶ 5.) The notices did not inform the cardholders of the pendency of this litigation. Nevertheless, Chase offers three main rationales for enforcement of the arbitration clauses to stay this litigation pending arbitration:

> Because Chase and its cardholders agreed in accord with the Delaware state law governing their credit card agreements to arbitrate their disputes, because the issues in the asserted claims fall within the scope of the arbitration provision, and because there is no congressional intent that the claims asserted in the instant lawsuit are non-arbitrable, this court must stay the trial of the litigation pending arbitration as to all unnamed plaintiff cardholders of Chase who agreed to the arbitration provision....

(Chase Mem. at 7–8.) Defendant Citibank joins Chase in this argument. (Memorandum in Support of Chase's Motion for Stay of Litigation, dated Jan. 7, 2005 ("Citibank Mem.") at 1.) These arguments are not persuasive.

As this Court held in its ruling on class certification, "Defendants' communication with putative class members was improper because they sought to alter the status of this litigation and the available remedies." *Currency Conversion II,* 224 F.R.D. at 570. Defendants Chase and Citibank contend that in so ruling, this Court erred because Second Circuit law allows communication with putative class members on any issue, without notice to plaintiffs' class counsel. (Transcript of Oral Argument,

---

**6.** There is no dispute that defendants Chase, Citibank, Diners Club and Providian incorporated arbitration clauses on their cardholder agreements after this litigation commenced. However, this Court has ruled that plaintiffs have failed to satisfy Rule 23 with respect to the Diners Club and Providian subclasses. *See supra* Section III. Accordingly, this Court only addresses arguments presented by Chase and Citibank.

dated Feb. 3, 2005 ("Tr.") at 23–24; Chase Mem. at 14–16.)

### A. Effect of Contract Principles on Enforceability of Arbitration Clauses

■ As noted above, arbitration clauses are governed under contract law. *See AT & T Techs.,* 475 U.S. at 648, 106 S.Ct. 1415; *United Steelworkers of Am.,* 363 U.S. at 582, 80 S.Ct. 1347. Courts must "remain attuned to well-supported claims that the agreement to arbitrate resulted from the sort of fraud or overwhelming economic power that would provide grounds 'for the revocation of any contract.'" *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 624, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). To determine the merit of contractual defenses, courts "apply ordinary state-law principles that govern the formation of contracts."[7] *First Options of Chi.,* 514 U.S. at 944, 115 S.Ct. 1920 (1995).

■ When consumers are not advised of the rights they are forfeiting, enforceability of arbitration clauses may be restricted. *See Brookhaven Hous. Coalition v. Solomon,* 583 F.2d 584, 593 (2d Cir.1978) ("If essential terms of an agreement are omitted . . ., no legally enforceable contract will result."); *see also Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 519 n. 14, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974) ("[A]n arbitration or forum-selection clause in a contract is not enforceable if the inclusion of that clause in the contract was the product of fraud or coercion."). This is particularly true of an adhesion contract. "[A] contract of adhesion is a contract formed as a product of a gross inequality of bargaining power between parties." *JLM Indus., Inc. v. Stolt–Nielsen SA,* 387 F.3d 163, 169 (2d Cir.2004); *see also* Black's Law Dictionary 318–19 (8th ed.

2004) (A contract of adhesion is "[a] standard-form contract prepared by one party, to be signed by the party in a weaker position, . . . with little choice about the terms."). "A court will find adhesion only when the party seeking to rescind the contract establishes that the other party used high pressure tactics, or deceptive language, or that the contract is unconscionable." *JLM,* 387 F.3d at 169; *see Brennan v. Bally Total Fitness,* 153 F.Supp.2d 408, 416 (S.D.N.Y.2001).

■ Adhesion contracts tainted by unconscionability are unenforceable. *See Brennan,* 153 F.Supp.2d at 416 ("An unconscionable contract of adhesion is not a valid contract."); *see also Ingle v. Circuit City Stores, Inc.,* 328 F.3d 1165, 1170 (9th Cir.2003) ("Unconscionability refers to an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." (internal quotations omitted)); *David L. Threlkeld & Co. v. Metallgesellschaft Ltd. (London),* 923 F.2d 245, 249 (2d Cir.1991) (noting that the "purpose of the unconscionability doctrine is to prevent unfair surprise and oppression" (internal quotations omitted)). Indeed, Section 208 of the Restatement (Second) of Contracts provides:

> If a contract or term thereof is unconscionable at the time the contract is made a court may refuse to enforce the contract, or may enforce the remainder of the contract without the unconscionable term, or may so limit the application of any unconscionable term as to avoid any unconscionable result.

Restatement (Second) of Contracts § 208 (1981).

---

7. Chase's cardholder agreements are governed by Delaware state law and Citibank's cardholder agreements are governed by South Dakota law. (Farrell Aff. Ex. B: Chase Card Agreement; Bridge Decl. Ex. 1: Citibank Card Agreement.)

A court may find unconscionability where a non-drafting party has no way of knowing a material fact. *See, e.g., Mobile Elec. Service, Inc. v. FirsTel, Inc.,* 649 N.W.2d 603, 606 (S.D.2002) (finding a one-sided contract unconscionable where the non-drafting party had no way of knowing that it was agreeing to pay a tariff); *Rozeboom v. Northwestern Bell Tel. Co.,* 358 N.W.2d 241, 244 (S.D.1984) ("[W]e have very recently spoken against contract provisions which are "one-sided" and declared that they are, in effect, against public policy and should be declared unconscionable."). A party acts unconscionably when it omits material information from a contract regarding the consumers' forfeiture of important protections. *See Flugge v. Flugge,* 681 N.W.2d 837, 842 (S.D.2004) (holding that a waiver of right occurs only when one in possession of a right, "with full knowledge of the material facts, does or forebears the doing of something inconsistent with the exercise of the right") (quoting *Action Mech. Inc. v. Deadwood Historic Pres. Comm'n,* 652 N.W.2d 742, 749 (S.D.2002)); *see also Johnson v. Rapid City Softball Ass'n,* 514 N.W.2d 693, 697 (S.D.1994) ("A release is not fairly made and is invalid if the nature of the instrument was misrepresented or there was other fraudulent or overreaching conduct."); *Ryan v. Weiner,* 610 A.2d 1377, 1382 (Del.Ch.1992) ("It is generally held that the unconscionability test involves the question of whether the provision amounts to a taking of an unfair advantage by one party over the other." (quoting *Jones Constr. Co. v. City of Dover,* 372 A.2d 540, 552 (Del.Sup.1977))); *Graham v. State Farm Mut. Auto. Ins. Co.,* 565 A.2d 908, 912 (Del.1989) (holding that to support a finding of unconscionability "[a] court must find that the party with superior bargaining power used it to take unfair advantage of his weaker counterpart").

There was no reasonable manner for cardholders to know that by failing to reject the arbitration clause, they were forfeiting their rights as potential plaintiffs in this litigation. Chase and Citibank do not contest that they did not notify cardholders about this litigation, but assert instead that they were not required to provide that information. (Reply Memorandum in Support of Chase's Motion for Stay of Litigation, dated Jan. 21, 2005 ("Chase Reply Mem.") at 2–5.) Chase argues it is not obliged "to describe existing lawsuits that may, but not necessarily will, be affected by the provision at some unspecified time in the future." (Chase Reply Mem. at 3.) This Court disagrees. The putative class members' rights in this litigation were protected as of the filing date of the complaint. *See Kahan v. Rosenstiel,* 424 F.2d 161, 169 (3d Cir.1970) (noting that a putative class members' rights in a litigation are protected as of the filing date of the complaint); *McDowall v. Cogan,* 216 F.R.D. 46, 50 (E.D.N.Y.2003) ("Rule 23(e) applies even in the context of putative class actions. Its reach to cases in the pre-certification stage reflects the requirement that courts, for the purposes of settlement, must presume that a class action is 'proper,' i.e., that the class has been certified, prior to actual certification."); *Ross v. Warner,* 80 F.R.D. 88, 90 n. 2 (S.D.N.Y.1978) ("It is well settled law that from the time of filing a class action, including the period before its certification, it is to be dealt with as such for purposes of dismissal or compromise."); *see also* 4 Alba Conte & Herbert Newberg, Newberg on Class Actions § 11:65 (2002) ("It is well settled law that during the interim between filing of a class action and the 23(c)(1) determination by the court, it must be assumed to be a class action for purposes of dismissal or compromise under 23(e) unless and until a contrary determination is made under 23(c)(1)." (internal quotations marks and citations omitted)).

As a result, this Court holds that Chase and Citibank cannot enforce the arbitration clause because those banks possessed information regarding this litigation which they withheld from their cardholders when they added the clause to their contracts. In the absence of candid disclosure, it would be unconscionable to allow Chase and Citibank to nullify cardholders' rights.

### B. Effect of Rule 23 on Enforceability of the Arbitration Clauses

■ A court has supervisory authority over a defendant's communications with putative class members. See Fed.R.Civ.P. 23(d). Indeed, "[b]ecause of the potential for abuse, a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." Gulf Oil v. Bernard, 452 U.S. 89, 100, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981); see also Hoffmann–La Roche Inc. v. Sperling, 493 U.S. 165, 171, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989) ("We have recognized that a trial court has a substantial interest in communications that are mailed for single actions involving multiple parties.").

■ A court must take steps to further the policies embodied in Rule 23. One policy of Rule 23 is the protection of class members from "misleading communications from the parties or their counsel." Erhardt v. Prudential Group, 629 F.2d 843, 846 (2d Cir.1980); see also In re WorldCom, Inc. Sec. Litig., No. 02 Civ. 3288(DLC), 2003 WL 22701241, at *8 (S.D.N.Y. Nov.17, 2003). That same policy concern applies where a party misleads class members by omitting critical information from its communications. Communications that threaten the choice of remedies available to class members are subject to a district court's supervision:

A district court's duty and authority under Rule 23(d) to protect the integrity of the class and the administration of justice generally is not limited only to those communications that mislead or otherwise threaten to create confusion and to influence the threshold decision whether to remain in the class. Certainly communications that seek or threaten to influence the choice of remedies are ... within a district court's discretion to regulate.

In re Sch. Asbestos Litig., 842 F.2d 671, 683 (3d Cir.1988); see also Keystone Tobacco Co., Inc v. U.S. Tobacco Co., 238 F.Supp.2d 151, 154 (D.D.C.2002) ("[T]he Court rejects defendants' position that it has no authority to limit communications between litigants and putative class members prior to class certification."); Ralph Oldsmobile Inc. v. Gen. Motors Corp., No. 99 Civ. 4567(AGS), 2001 WL 1035132, at *2 (S.D.N.Y. Sept.7, 2001) ("[A] court's power to restrict communications between parties and potential class members [ ] appl[ies] even before a class is certified."); Haffer v. Temple Univ. of the Commonwealth Sys. of Higher Educ., 115 F.R.D. 506, 512 (E.D.Pa.1987) (discussing a court's curative powers after "parties initiate improper communications with class members"). A court may "limit communications with absent class members where the communications were ... an improper attempt to undermine Rule 23 by encouraging class members not to join the suit." Belt v. Emcare, Inc., 299 F.Supp.2d 664, 667 (E.D.Tex.2003); see also Kleiner v. First Nat. Bank of Atlanta, 751 F.2d 1193, 1199, 1206 (11th Cir.1985) (finding that a district court had the power to void "opt-outs" by class members that stemmed from defendant's improper communications with putative class members). Indeed, a district court's authority under Rule 23(d) is not limited to communications that actually mislead or otherwise threaten to create confusion, but extends to communications that interfere with the proper administration of a class action or those that abuse

the rights of members of the class. *Cobell v. Norton*, 212 F.R.D. 14, 19 (D.D.C.2002).

■■■ "A unilateral communications scheme, moreover, is rife with potential for coercion. If the class and the class opponent are involved in an ongoing business relationship, communications from the class opponent to the class may be coercive." *Kleiner*, 751 F.2d at 1202 (internal quotations, citations and brackets omitted); *see also Hampton Hardware v. Cotter & Co.*, 156 F.R.D. 630, 633–34 (N.D.Tex.1994) (holding evidence of letters discouraging participation in lawsuit, an ongoing business relationship between the parties and plaintiffs' dependence on defendant for supplies sufficient to prohibit all litigation-related communication prior to class certification); *Tedesco v. Mishkin*, 629 F.Supp. 1474, 1484 (S.D.N.Y.1986). Here, for example, the potential class consisted of cardholders who depend on defendants for their credit needs. These cardholders have no other realistic source of information regarding this litigation. Thus, in light of the cardholders' dependence on defendants for their future credit needs and information, this Court finds that Chase's and Citibank's actions are potentially coercive and improper. *See Ralph Oldsmobile*, 2001 WL 1035132, at *4 ("[A] finding of potential coercion is warranted here," because "the potential class members depend upon the defendant for infor-mation, supplies, and credit."); *see also Kleiner*, 751 F.2d at 1203 ("Unsupervised, unilateral communications with the plaintiff class sabotage the goal of informed consent by urging exclusion on the basis of a one-sided presentation of the facts, without opportunity for rebuttal."); *Hampton Hardware*, 156 F.R.D. at 633 (noting that because the defendant and potential class members were involved in an on-going business relationship, there was a potential for coercion).

■■■ Indeed, when a defendant contacts putative class members for the purpose of altering the status of a pending litigation, such communication is improper without judicial authorization. *See Hampton Hardware*, 156 F.R.D. at 632 (noting that defendant's communications affecting a class member's decision to participate in the litigation are improper); *see also In re Sch. Asbestos*, 842 F.2d at 682 n. 23 (listing cases where defendants "sought either to affect class members' decisions to participate in the litigation or to undermine class plaintiffs' cooperation with or confidence in class counsel").

Citing *Gulf Oil*, Chase and Citibank argue that this Court may not restrict their communications with potential class members absent specific findings of abuses by defendants.[8] (Chase Mem. at 17; Citibank Mem. at 1.) Defendants' reliance on *Gulf Oil* is misplaced. In that case, the Su-

---

8. The Supreme Court has cautioned that in fashioning an appropriate remedy, judicial limitations on the parties' commercial speech should be minimized. *See Gulf Oil*, 452 U.S. at 101–02, 101 S.Ct. 2193. Here, defendants do not make any argument based on the First Amendment. In any event, "the Constitution accords less protection to commercial speech than to other constitutionally safeguarded forms of expression." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 64–65, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983); *see also United States v. United Foods, Inc.*, 533 U.S. 405, 409–10, 121 S.Ct. 2334, 150 L.Ed.2d 438 (2001); *Kleiner*, 751 F.2d at 1205 (commer-cial speech does not call "into play the full panoply of First Amendment safeguards against prior restraint" (internal quotation omitted)). Defendants' communications with cardholders were commercial in nature, and therefore this Court may restrict it to ensure that the cardholders' rights in this litigation are not vitiated. *See Gulf Oil*, 452 U.S. at 104 n. 21, 101 S.Ct. 2193 ("In the conduct of a case, a court often finds it necessary to restrict the free expression of participants, including counsel, witnesses, and jurors.... We also note that the rules of ethics properly impose restraints on some forms of expression.").

preme Court addressed restrictions imposed by the trial court on *plaintiffs'* counsel's communications with putative class members. 452 U.S. at 101, 101 S.Ct. 2193 (noting that the restrictions "made it more difficult for respondents, as the class representatives, to obtain information about the merits of the case from the persons they sought to represent"). The Supreme Court concluded that the restriction "interfered with [the class counsel's] efforts to inform potential class members of the existence of this lawsuit, and may have been particularly injurious—not only to respondents but to the class as a whole—because the employees at that time were being pressed to decide whether to accept a backpay offer from Gulf that required them to sign a full release of all liability for discriminatory acts." *Gulf Oil,* 452 U.S. at 101, 101 S.Ct. 2193. Thus, the Supreme Court's admonition was animated by its concern for the best interests of putative class members. The opposite force is at work here: defendants acted *against* the best interests of the putative class members.

Defendants Chase and Citibank further note that *Weight Watchers of Philadelphia, Inc. v. Weight Watchers International, Inc.,* 455 F.2d 770 (2d Cir.1972), permits them to settle cases with putative class members prior to class certification. (Chase Mem. at 14–15.) They argue that if they can settle actions prior to class certification, "it follows *a fortiori* that they may seek agreement to resolve their disputes in an arbitral forum." (Chase Mem. at 16.) *Weight Watchers* is inapposite. The *Weight Watchers* defendants' communications with absent class members were supervised by the district court and advance notice to plaintiff's counsel was re-

quired. *Weight Watchers,* 455 F.2d at 772. Moreover, the plaintiffs were aware of the pending litigation. Chase correctly observes that the *Weight Watchers* court did not require any curative action for unsupervised communications with the putative class members. (Tr. at 49.) However, those early communications in *Weight Watchers* simply informed the putative class that the litigation would be vigorously defended, that the defendant was seeking helpful evidence and that unfavorable publicity would be detrimental to its image. *Weight Watchers,* 455 F.2d at 771. By contrast, Chase's and Citibank's change of terms notices were not informational but transactional, and designed to take rights away from their cardholders.

In sum, defendants' unsupervised communications were improper because they sought to eliminate putative class members' rights in this litigation. Thus, this Court holds that those arbitration clauses may not be enforced because Chase and Citibank added them, without notice, after this litigation commenced. *See Long v. Fid. Water Sys., Inc.,* No. C–97–20118 RMW, 2000 WL 989914, at *3 (N.D.Cal. May 26, 2000) (refusing to require arbitration where the agreement was modified after the filing of a putative class action); *Carnegie v. H & R Block, Inc.,* 180 Misc.2d 67, 70–72, 687 N.Y.S.2d 528, 531–32 (Sup. Ct.1999) (same); *cf. Weight Watchers,* 455 F.2d at 772.

### C. Effect of the Rules Enabling Act on Enforceability of the Arbitration Clauses

 Chase and Citibank advance the new argument that their arbitration agreements embody substantive contractual rights [9] that cannot be impaired by Rule

---

**9.** Plaintiffs incorrectly characterize arbitration as a procedural right. (Pl. Mem. at 15–16.) It is well settled that a contractual agreement to arbitrate creates a substantive

right to an arbitral forum. *See Southland Corp. v. Keating,* 465 U.S. 1, 11–13, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984); *Bernhardt v. Poly-*

23. (Chase Mem. at 12–14.) In essence, they argue that the Rules Enabling Act, 28 U.S.C. § 2072, limits this Court's authority to restrict enforcement of the arbitration clauses. This Court disagrees.

■ The Federal Rules of Civil Procedure ("Federal Rules") were enacted pursuant to the Rules Enabling Act, which provides that the Federal Rules "shall not abridge, enlarge, or modify any substantive right." 28 U.S.C. § 2072(b). However, the Federal Rules carry a heavy presumption of validity. *Hanna v. Plumer,* 380 U.S. 460, 471, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965). Courts have been "instructed to apply the Federal Rule[s], and can refuse to do so only if the Advisory Committee, [the Supreme Court], and Congress erred in their prima facie judgment that the Rule in question transgresses neither the terms of the Enabling Act nor constitutional restrictions." *Hanna,* 380 U.S. at 471, 85 S.Ct. 1136.

■ When a Federal Rule and a state law collide, a court must "determine whether, when fairly construed, the scope of [the Federal Rule] is 'sufficiently broad' to cause a 'direct collision' with the state law or, implicitly, to 'control the issue' before the court, thereby leaving no room for the operation of that law." *Burlington N. R.R. Co. v. Woods,* 480 U.S. 1, 4–5, 107 S.Ct. 967, 94 L.Ed.2d 1 (1987) (quoting *Walker v. Armco Steel Corp.,* 446 U.S. 740, 749–50 n. 9, 100 S.Ct. 1978, 64 L.Ed.2d 659 (1980)); *see also Stewart Org. v. Ricoh Corp.,* 487 U.S. 22, 27 n. 4, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988) (noting that the proper inquiry is whether "the federal statute [is] sufficiently broad to cover the point in dispute"). Federal Rules must be "applied if [they] represent[ ] a valid exercise of Congress' rulemaking authority, which originates in the Constitution and has been bestowed on this Court by the

Rules Enabling Act." *Burlington N. R.R.,* 480 U.S. at 5, 107 S.Ct. 967. If a Federal Rule is coextensive with a state law establishing a substantive right, then a court must ascertain whether that Federal Rule is a valid exercise of Congress' rulemaking authority. *Burlington N. R.R.,* 480 U.S. 1, 107 S.Ct. 967, 94 L.Ed.2d 1; *see generally Leider v. Ralfe,* No. 01 Civ. 3137(HB), 2005 WL 152025 (S.D.N.Y. Jan.25, 2005); *Seck by Seck v. Hamrang, M.D.,* 657 F.Supp. 1074 (S.D.N.Y.1987).

Defendants' musings on the Rules Enabling Act do not harmonize with a plain reading of Rule 23(d) and the relevant state statutes. Rule 23(d) states:

> In the conduct of actions to which this rule applies, the court may make appropriate orders: (1) determining the course of proceedings or prescribing measures to prevent undue repetition or complication in the presentation of evidence or argument; (2) requiring, for the protection of members of the class or otherwise for the fair conduct of the action, that notice be given in such manner as the court may direct to some or all of the members of any step in the action, or of the proposed extent of the judgment, or of the opportunity of members to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or otherwise to come into the action; (3) imposing conditions on the representative parties or on interveners; (4) requiring that the pleading be amended to eliminate therefrom allegations as to representation of absent persons, and that the action proceed accordingly; (5) dealing with similar procedural matters.

Fed.R.Civ.P. 23(d). In an entirely different vein, the Delaware statute conferring Chase's substantive right to amend its revolving credit plan agreements states:

*graphic Co. of Am.,* 350 U.S. 198, 201–02, 76 S.Ct. 273, 100 L.Ed. 199 (1956).

[A] bank may at any time and from time to time amend [a revolving credit plan agreement] in any respect, whether or not the amendment or the subject of the amendment was originally contemplated.... [S]uch amendment may change terms by the addition of new terms or by the deletion or modification of existing terms, whether relating to ... arbitration or other alternative dispute resolution mechanisms.

5 Del Code Ann. § 952(a). A plain reading of Rule 23 and the Delaware statute reveals that there is no collision between them. A finding that Chase did not give fair notice of this litigation to cardholders does not restrict Chase's contractual rights under Delaware law. Chase is free to amend its revolving credit agreements under Delaware law, so long as its actions do not impair the integrity of this litigation.[10] *See Burlington N. R.R.*, 480 U.S. at 8, 107 S.Ct. 967 (holding that a rule which "affects only the process of enforcing litigants' rights, and not the rights themselves" does not exceed the constraints of the Rules Enabling Act); *Hanna*, 380 U.S. at 473–74, 85 S.Ct. 1136 ("To hold that a Federal Rule of Civil Procedure must cease to function whenever it alters the mode of enforcing state-created rights would be to disembowel either the Constitution's grant of power over federal procedure or Congress's attempt to exercise that power in the Enabling Act."). Similarly, Citibank's contractual rights under the relevant South Dakota statute, S.D. Codified Laws § 54–11–10, are not abrogated by Rule 23(d).

Defendants' reliance on *In re Salomon Shareholers' Derivative Litigation*, 91 Civ. 5500(RPP), 1994 WL 533595 (S.D.N.Y. Sept. 30, 1994), for the proposition that the policies underlying Rule 23 cannot be invoked to override the arbitration rights of the parties is misplaced. (Chase Mem. at 13.) *Salomon* held only that Rule 23.1 cannot be construed to bar shareholder derivative suits from arbitration. *In re Salomon Shareholders' Derivative Litig.*, 1994 WL 533595, at *8. As already noted, this Court is not barring arbitration agreements with cardholders, but is merely subjecting defendants' actions to the policy considerations underlying Rule 23.

Defendants' argument that a substantive right is abridged if this Court does not enforce their arbitration agreements applies an inappropriate and mechanical outcome-determinative test. *See Caiola v. Berkshire Med. Ctr., Inc.*, No. 04 Civ. 623 (FJS/DRH), 2004 WL 2607805, at *3 (N.D.N.Y. Nov.17, 2004) ("[T]he outcome-determinative test cannot be mechanically applied and other relevant factors must be considered."); *see also Byrd v. Blue Ridge Rural Elec. Coop.*, 356 U.S. 525, 538–40, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958); *118 East 60th Owners, Inc. v. Bonner Props., Inc.*, 677 F.2d 200, 204 n. 6 (2d Cir.1982). Indeed, literal application of defendants' outcome-determinative test would lead to absurd results, since "any rule, no matter how clearly 'procedural,' can affect the outcome of litigation." *Hanna*, 380 U.S. at 475, 85 S.Ct. 1136 (Harlan, J., concurring).

Thus, this Court concludes that the Rules Enabling Act does not prohibit a finding that the Chase and Citibank arbitration clauses are unenforceable.

---

**10.** Defendants' reliance on the Fifth Circuit's ruling in *Douglas v. NCNB Texas National Bank*, 979 F.2d 1128 (5th Cir.1992), is of no avail. (Tr. at 27.) That case held that a creditors right to a non-judicial forum under applicable state law could not be voided by the Federal Rules of Civil Procedure. *Douglas*, 979 F.2d at 1129–30. In contrast, this Court is not voiding defendants' right to arbitrate their disputes; the Court is merely subjecting the contractual right of Chase and Citibank to the procedural considerations imposed by the Federal Rules.

## D. *Waiver of Arbitration Rights*

 While this Court concludes that the Chase and Citibank arbitration clauses are unenforceable, for the sake of completeness it addresses plaintiffs' waiver argument. Specifically, plaintiffs argue that even if this Court were to find the arbitration clauses enforceable, the defendants' failure to compel arbitration or seek a stay until now constitutes a waiver. (Pl. Mem. at 19–20.) Chase and Citibank counter that they have not waived their rights to a stay pending arbitration:

> [P]rior to this Court's class certification order of October 15, 2004, the then-absent class members as to whom this motion is directed were not yet parties to this litigation, and the instant motion to stay the trial of their claims would not have been ripe.

(Chase Reply Mem. at 9–10.)

 A party may waive its right to arbitration by expressly indicating that it wishes to resolve its claims in court. *Gilmore v. Shearson/Amer. Express Inc.,* 811 F.2d 108, 112 (2d Cir.1987), *overruling on other grounds recognized by McDonnell Douglas Fin. Corp. v. Pa. Power & Light Co.,* 849 F.2d 761, 763–64 (2d Cir.1988). Alternately, a party may impliedly waive its right to enforce a contractual arbitration clause when it "engages in protracted litigation that results in prejudice to the opposing party." *S & R Co. of Kingston v. Latona Trucking,* 159 F.3d 80, 83 (2d Cir. 1998) (citations omitted); *Manos v. Geissler, BRG,* 321 F.Supp.2d 588, 593 (S.D.N.Y.2004) (holding that a "party that engages in 'protracted litigation' waives his right to arbitrate when an order compelling arbitration would result in prejudice to the party opposing arbitration"); *see also Standard Microsystems Corp. v. Dahod,* 84 F.Supp.2d 396, 398 (E.D.N.Y.2000) (stating that prejudice "refers to the inherent unfairness—in terms of delay, expense, or damage to a party's legal position—that

occurs when the party's opponent forces it to litigate an issue and later seeks to arbitrate that same issue").

 Factors to consider in deciding whether waiver occurred include: "(1) the time elapsed from the commencement of litigation to the request for arbitration; (2) the amount of litigation (including exchanges of pleadings, any substantive motions, and discovery); and (3) proof of prejudice, including taking advantage of pre-trial discovery not available in arbitration, delay, and expense." *S & R,* 159 F.3d at 83. An inquiry into whether an arbitration right has been waived is fact specific and not susceptible to bright line rules. *Cotton v. Slone,* 4 F.3d 176, 179 (2d Cir.1993). Indeed, "waiver is more likely to be found the longer the litigation goes on, the more a party avails itself of the opportunity to litigate, and the more that party's litigation results in prejudice to the opposing party." *Thyssen, Inc. v. Calypso Shipping Corp., S.A.,* 310 F.3d 102, 105 (2d Cir.2002).

Here, the parties have litigated since February 28, 2001, when plaintiffs filed the first action. By March 2002, when defendants Bank of America, Bank One Delaware (f.k.a. First USA) and MBNA moved to compel arbitration, defendants Chase and Citibank had added arbitration clauses to their cardholder agreements. (Chase Mem. at 2; Citibank Mem. at 1.) However, Citibank and Chase did not move to compel arbitration at that time. Subsequent to this Court's July 7, 2003 ruling on defendants' motion to dismiss, Chase informed this Court of its intention to move to compel arbitration of claims by the named plaintiffs and "any unnamed Chase credit cardholders." (Declaration of Michael Buchman, dated Jan. 18, 2005 ("Buchman Decl.") Ex. 13: Letter to Court from Peter E. Greene, dated Nov. 3, 2003.) Nevertheless, Chase still did not move.

Extensive nationwide discovery involving nearly one hundred depositions and the review of tens of thousands of documents has been conducted over the last three years. (Pl. Mem. at 21.) Presently, expert discovery is in full swing and the trial is scheduled to commence in seven months. (*see, e.g.,* Pl. Mem. at 21.) Plaintiffs argue that they will be unfairly prejudiced if this Court grants the motion by Chase and Citibank. This Court agrees.

This Court rejects Chase's and Citibank's argument that prior to the class certification order, the instant motion to stay the trial of their claims would not have been ripe. (*See* Buchman Decl. Ex. 13.) Indeed, the putative class members' rights in this litigation were protected as of the filing date of the complaint. *See Kahan,* 424 F.2d at 169; *McDowall,* 216 F.R.D. at 50. Further, Chase's November 3, 2003 letter undermines their present argument, since that letter sought to compel arbitration against future class members.

In view of the advance stage of this litigation, failure to timely move for a stay warrants a finding of waiver against Chase and Citibank. *See S & R,* 159 F.3d at 83.

### E. *Chase and Citibank Cardholders Covered by this Ruling*

■ Chase and Citibank seek clarification whether this Court's ruling encompasses three categories of cardholders: (1) cardholders who opened new credit card accounts after this suit began, (2) cardholders who first became cardholders due to account acquisitions after this litigation began, and (3) cardholders whose first foreign exchange transaction on their credit card occurred after the addition of the arbitration clause to their card agreement. (Def. Recon. Mem. at 10–11.) Plaintiffs oppose defendants' request for clarification, arguing that "[a]llowing defendants to use arbitration agreements imposed during

litigation to prevent additional cardholders injured by ongoing antitrust violations from participating in this action would alter the status of the litigation and interfere with this Court's jurisdiction over this controversy." (Pl. Recon. Opp. at 12.)

When arbitration clauses were included in the credit card agreements for these categories of cardholders, they were not putative class members. As a result, they had no rights in this litigation. Indeed, this Court agrees with defendants that there is no basis for restricting a defendant from communicating with persons who are not putative class members. *Cf. Kahan,* 424 F.2d at 169 (noting that a *putative* class members' rights in a litigation are protected as of the filing date of the complaint). Accordingly, this Court holds that because the non-putative class members agreed to arbitration *before* they became putative class members in this litigation, the arbitration clauses in their cardholder agreements can be enforced. Because these cardholders' rights were hypothetical at the time the arbitration clauses were added, that change did not alter the status of the pending litigation. Further, this Court's ruling is limited to the claims in this litigation, because it was information about this litigation that Chase and Citibank omitted from their change of terms notices.

### V. *Plaintiffs' Allegations of Collusion by Defendants*

■ Plaintiffs assert that this Court should invalidate all arbitration clauses because their incorporation into cardholder agreements was the product of collusion among all defendants. (Tr. at 33–35; Pl. Mem. at 18–19.) This Court disagrees.

Plaintiffs propose two distinct grounds for invalidation of their arbitration agreements: (1) collusion by defendants renders their agreements unenforceable, and (2)

defendants' collusive behavior was procedurally unconscionable, which, combined with a waiver of class action remedies, renders the contracts unenforceable. While plaintiffs seem to assert that the collusion is an antitrust violation (Tr. at 33–34), no such allegation is advanced in the Complaint.

*Kelly v. Kosuga*, holding that an antitrust violation is severable from an "intelligible economic transaction in itself," is dispositive. 358 U.S. 516, 521, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959); *see also Viacom Int'l Inc. v. Tandem Prods., Inc.*, 526 F.2d 593 (2d Cir.1975) (analyzing the *Kelly* decision, and holding that where a separate antitrust claim was available to plaintiffs, it should not be a defense to enforcement of an otherwise valid contract); *Wechsler v. Hunt Health Sys., Ltd.*, 216 F.Supp.2d 347 (S.D.N.Y.2002) (holding that a court may enforce a contract when it does not mandate illegal conduct, despite an antitrust violation).

The arbitration agreement is part of an "intelligible economic transaction" in which the parties agreed to a mechanism for resolving disputes. In contrast to the circumstance where Chase and Citibank withheld material information from cardholders, there is no evidence that Bank One Delaware (f.k.a. First USA), Bank of America, MBNA or Household withheld relevant information from their cardholders. Thus, these issuing banks' arbitration agreements may be enforced. *See Rooney v. Columbia Pictures*, 538 F.Supp. 211 (S.D.N.Y.1982) (holding that an agreement in violation of antitrust laws may be enforceable where the parties' underlying conduct is legal).

Plaintiffs' argument that defendants' unlawful collusion combined with a waiver of class remedies renders the contracts unconscionable is also without merit. Plaintiffs cite no authority from any relevant state court.[11] Instead, they offer California law, which does not govern any of the arbitration agreements. (Pl. Mem. at 18 (citing *Ting v. AT&T*, 319 F.3d 1126 (9th Cir.2003) (applying California law)).) Agreements to waive class remedies are enforceable. *See, e.g., Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) (holding that one may waive his right to sue as a class even though the Age Discrimination in Employment Act (ADEA) expressly references a right to class remedies); *Carter v. Countrywide Credit Indus., Inc.*, 362 F.3d 294 (5th Cir.2004) (holding that the inability to proceed as a class does not deprive plaintiffs of substantive rights under the Fair Labor Standards Act (FLSA)); *Livingston v. Assoc. Fin. Inc.*, 339 F.3d 553 (7th Cir.2003) (arbitration agreement which expressly prohibited class actions was valid against TILA claimants seeking class certification); *Snowden v. CheckPoint Check Cashing*, 290 F.3d 631 (4th Cir.2002) (enforcing an arbitration clause that prohibited class actions and holding that public policy is not upset by allowing for waiver of class action remedies of consumer protection claims); *Randolph v. Green Tree Fin. Corp.*, 244 F.3d 814 (11th Cir.2001) (holding that TILA does not create a nonwaivable right to sue as a class).

In *Gilmer*, the Supreme Court held that the right to vindicate a federal statutory right in a judicial forum is only nonwaivable if "Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue." 500 U.S. at 26, 111 S.Ct. 1647 (quotations omitted). Thus, the party op-

---

11. The account agreements in question are governed by Arizona, Delaware, Nevada, New Hampshire and South Dakota law. (Defendants' Joint Reply in Support of their Motion for a Stay Pending Arbitration, dated Jan. 21, 2005, at 9.)

posing an otherwise valid arbitration agreement bears the burden of showing Congressional intent to create nonwaivable rights to a judicial forum. *Gilmer,* 500 U.S. at 26, 111 S.Ct. 1647; *Randolph,* 244 F.3d at 817; *see also Dean Witter,* 470 U.S. at 221, 105 S.Ct. 1238 ("The preeminent concern of Congress in passing the [FAA] was to enforce private agreements into which parties had entered, and that concern requires that we rigorously enforce agreements to arbitrate, . . . at least absent a countervailing policy manifested in another federal statute. . . . By compelling arbitration of state-law claims, a district court successfully protects the contractual rights of the parties and their rights under the Arbitration Act.").

■ Here, plaintiffs have failed to demonstrate that Congress intended TILA to create nonwaivable class action rights. Accordingly, the arbitration agreements are enforceable by all defendants other than Chase and Citibank.

## VI. *Arbitration Based on Estoppel*

Defendants ask this Court to reconsider its holding that cardholders who signed enforceable arbitration agreements with their issuing banks ("arbitrating cardholders") may litigate their claims against non-signatory bank and network defendants. *See Currency Conversion II,* 224 F.R.D. at 570. Regardless of whether this Court finds any claim against the non-signatory defendants arbitrable, all defendants move to stay those claims pending arbitration.

Defendants contend that reconsideration is appropriate here in light of the Second Circuit's intervening decision in *JLM Industries, Inc. v. Stolt–Nielsen SA,* 387 F.3d 163. Indeed, *JLM* addressed the specific issue raised by this Court's October 15, 2004 Memorandum and Order—namely, whether and to what extent a plaintiff who signed a valid arbitration agreement is estopped from litigating price-fixing conspiracy claims against a non-signatory alleged to have conspired with a party to the arbitration agreement. 387 F.3d at 177–79. Because *JLM* represents the first decision of the Second Circuit to address the precise issue on which this Court ruled, this Court agrees that reconsideration is appropriate.

■ Generally, "a party cannot be required to submit to arbitration any dispute which [it] has not agreed to submit." *Transit Mix Concrete Corp. v. Local Union No. 282,* 809 F.2d 963, 967 (2d Cir. 1987) (internal quotation marks omitted). However, "a non-signatory to an arbitration agreement may compel a signatory to that agreement to arbitrate a dispute where a careful review of 'the relationship among the parties, the contracts they signed . . . and the issues that had arisen' among them discloses that 'the issues the [non-signatory] is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.'" *JLM,* 387 F.3d at 177 (quoting *Choctaw Generation Ltd. P'Ship v. Am. Home Assurance Co.,* 271 F.3d 403, 406 (2d Cir. 2001)); *accord Thomson–CSF, S.A. v. Am. Arbitration Ass'n,* 64 F.3d 773, 779 (2d Cir.1995); *Currency Conversion I,* 265 F.Supp.2d at 402.

■ A court must scrutinize any application requiring a plaintiff to arbitrate his claims against a non-signatory, *Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.,* 198 F.3d 88, 97 (2d Cir.1999), and a decision granting such relief "requires careful justification," *Choctaw,* 271 F.3d at 406. "[S]uch a finding should only be made after careful review of the relationship between the parties, the contracts they signed, and the issues that arose between them." *Astra Oil Co. v. Rover Navigation, Ltd.,* 344 F.3d 276, 279 (2d Cir.2003). The court must find that the plaintiff's

claims are intertwined with the underlying contract and that there is a close relationship between the non-signatory and the plaintiff's actual counter-signatory. *Thomson–CSF*, 64 F.3d at 779; *Camferdam v. Ernst & Young Int'l, Inc.*, No. 02 Civ. 10100(BSJ), 2004 WL 307292, at *6 (S.D.N.Y. Feb.13, 2004); *Fluor Daniel Intercont'l, Inc. v. Gen. Elec. Co.*, No. 98 Civ. 7181(WHP), 1999 WL 637236, at *6 (S.D.N.Y. Aug.20, 1999). The inquiry is "fact-specific." *JLM*, 387 F.3d at 178.

### A. The JLM Case

*JLM* involved a group of chemical traders ("JLM") who claimed that the shipping companies with whom they contracted had engaged in an antitrust conspiracy to fix the freight rates they charged for transporting chemicals. 387 F.3d at 167–68. In each of its transactions with the various shipping companies, JLM signed the same standard-form charter. *JLM*, 387 F.3d at 167. That contract contained a broad arbitration clause through which the parties agreed to arbitrate "[a]ny and all differences and disputes of whatsoever nature arising out of this Charter." *JLM*, 387 F.3d at 167. However, the *JLM* defendants were not the signatories to the shipping charters but, instead, were the parent corporations ("Owners") of the signatories. *JLM*, 387 F.3d at 167. Nonetheless, the Owners moved to compel JLM to arbitrate its claims against them.

The Court of Appeals held that JLM was estopped from avoiding arbitration based on the agreements it entered into with the defendants' subsidiaries. The Second Circuit found that "it is the fact of JLM's entry into the charters containing allegedly inflated price terms that gives rise to the claimed injury." *JLM*, 387 F.3d at 178. In particular, the Second Circuit found that JLM was estopped from arguing against arbitration because "[t]he questions the Owners seek to arbitrate are undeniably intertwined with the charters." *JLM*, 387 F.3d at 178.

Importantly, the Court of Appeals held that the doctrine of estoppel required JLM to arbitrate its claims of joint and several liability against Owners alleged to have conspired with the parent corporation of each charter countersignatory. *JLM*, 387 F.3d at 178 n. 7. The Second Circuit noted that the doctrine of estoppel is "not limited to relations among corporate parents and their signatory subsidiaries." *JLM*, 387 F.3d at 178 n. 7. Relying on plaintiffs' factual allegations and legal claims, the Second Circuit reasoned that estoppel was appropriate:

> Because, as JLM asserts in its amended complaint, *all* of the Owners conspired, each with the others, to inflate the freight terms of any one such contract, any claim against an Owner jointly liable for the injury caused by that contract is inextricably intertwined with the arbitrable claim against the Owner liable under that contract.

*JLM*, 387 F.3d at 178 n. 7.

### B. Reconsideration in Light of JLM

In certifying various classes, this Court held that the arbitration clause could be enforced not only by the issuing banks that drafted the agreement but also by those "entities bearing a 'close relationship' with the issuing banks, such as the issuing banks' parent or subsidiary corporations." *Currency Conversion II*, 224 F.R.D. at 570 (citing *Currency Conversion I*, 265 F.Supp.2d at 403). However, because the non-signatory banks "were not parties to those agreements, and the contract provisions did not extend to them," this Court held that plaintiffs were not estopped from litigating their claims against those banks. *Currency Conversion II*, 224 F.R.D. at 570 (citing *Currency Conversion I*, 265 F.Supp.2d at 410). This

Court did not address the arbitrability of class members' claims against the network defendants.

In urging reconsideration, defendants contend that the estoppel doctrine requires class members with valid arbitration agreements to arbitrate their claims against all defendants. (Def. Recon. Mem. at 2–6.) Defendants argue that such a conclusion is compelled by the strong parallel between plaintiffs' price-fixing conspiracy claims and the claims in *JLM*. (Def. Recon. Mem. at 4–6.) Plaintiffs respond that *JLM* should be confined to the facts of that case which are distinguishable from this litigation. (Pl. Recon. Mem. at 2–8.) In particular, plaintiffs argue that *JLM* should not be read as requiring a plaintiff to arbitrate a conspiracy claim simply because a defendant is alleged to have conspired with the plaintiff's arbitration agreement countersignatory. (Pl. Recon. Mem. at 6.)

Indeed, the Second' Circuit cautioned that its holding should not be read "to suggest that a claim against a co-conspirator of a party alleged to have engaged in antitrust violations will always be intertwined to a degree sufficient to work an estoppel." *JLM*, 387 F.3d at 178 n. 7. Nonetheless, the Court found that the issues JLM was seeking to litigate against non-signatory Owners were sufficiently intertwined with its arbitrable claims against the corporate parents of each charter's countersignatory because: (1) "non-signatory Owners have a close relationship with the parties bound to arbitrate," (2) "a claim of joint and several liability concerns that relationship," and (3) "the dispute is closely linked to a dispute that is subject to arbitration in the underlying contract." *JLM*, 387 F.3d at 178 n. 7 (internal quotation marks and alterations omitted); *see also Choctaw*, 271 F.3d at 406 (finding estoppel appropriate because of the "tight relatedness of the parties, contracts and

controversies"); *Currency Conversion I*, 265 F.Supp.2d at 402–03 (estopping plaintiffs from avoiding arbitration with the parent corporations because (1) the parents and signatory subsidiaries were in a "close relationship"; (2) any claims against the corporate parents "revolve[ ] around their respective subsidiaries' issuance of credit cards"; and (3) the claims against both parents and subsidiaries "arise from the cardholder agreements").

### 1. *Network Defendants*

 As discussed below, plaintiffs' claims against the network defendants warrant estoppel because: (1) the network defendants have a "close relationship" with the issuing banks; (2) plaintiffs' antitrust claims against the networks "concern[ ] that relationship"; and (3) those claims are "closely linked" to plaintiffs' claims against their own issuing banks. *See JLM*, 387 F.3d at 178 n. 7.

First, the Complaint depicts a "close relationship" between the network defendants and the issuing banks, which are members of the network associations. *See JLM*, 387 F.3d at 178 n. 7; *see also Astra Oil*, 344 F.3d at 281. Plaintiffs allege that "VISA and MasterCard ... act on behalf of their member institutions, and the member institutions act on behalf of VISA and MasterCard." (Compl. ¶ 73.) More than simply an agency relationship, the Complaint alleges that the issuing banks control the network defendants. (Compl. ¶¶ 89–91, 93.) Specifically, the Complaint describes that VISA and MasterCard are "membership corporations created, owned, governed and operated by their member financial institutions" through a joint venture, and that the issuing bank defendants "are among the banks which owned and controlled the operations of VISA and MasterCard." (Compl. ¶¶ 34, 37, 72, 88.) The board of directors of each

network includes executives from the issuing bank defendants. (Compl.¶¶ 34, 37, 89, 93–94.) In short, the Complaint alleges that the banks have insinuated themselves into the network defendants to such a degree that the networks are effectively part of the member banks' operations. *See Astra Oil,* 344 F.3d at 281 (compelling arbitration because, in part, the plaintiff treated the defendant "as if it were a party to the charter"); *Smith/Enron,* 198 F.3d at 98 (holding that plaintiff was estopped from arguing that the non-signatories were distinct from the signatories because plaintiff had treated them collectively "as a single unit" in a previous lawsuit). As such, plaintiffs have alleged a "close relationship" between the network defendants and the issuing banks.

Second, plaintiffs' claims "concern" and, in fact, revolve around the "close relationship" between the issuing banks and the network defendants. *See JLM,* 387 F.3d at 178 n. 7. The Complaint alleges that, in assessing currency conversion fees on foreign purchases, the network defendants acted "on behalf of, and in collaboration with, the member banks that govern them (including the Issuing Banks)." (Compl.¶ 99.) Because the networks have no direct contact with cardmembers, their currency conversion fee is imposed through the issuing banks. (Tr. at 48–49, 51.) That fee is provided for in the cardholder agreements and mentioned in each issuing banks' initial disclosures. (Tr. at 48–49; Compl. ¶ 127.) Thus, the "close relationship" between the issuing banks and the network defendants is integral to plaintiffs' price-fixing claims against the networks.

Lastly, plaintiffs' claims against the network defendants are "closely linked" to the arbitrable claims against the issuing banks. *See JLM,* 387 F.3d at 178 n. 7; *see also Choctaw,* 271 F.3d at 408 ("[T]he present controversy ... is essentially an aspect of the same controversy now in arbitration between the two signatories."). This Court has previously held plaintiffs' claims against the parent corporations of their issuing banks arbitrable because the alleged price-fixing conspiracy is "at the heart of the underlying contract[s] containing the arbitration agreement[s]." *Currency Conversion I,* 265 F.Supp.2d at 403; *see also Currency Conversion II,* 224 F.R.D. at 570. Just as in *JLM,* the Complaint alleges that the network defendants conspired with the issuing banks, and vice versa, to set the currency conversion fees. *See JLM,* 387 F.3d at 178 n. 7 ("[A]ny claim against an Owner jointly liable for the injury caused by [any one] contract is inextricably intertwined with the arbitrable claim against the Owner liable under that contract."); *see also Choctaw,* 271 F.3d at 407 (finding estoppel warranted for claims "linked textually" to the contract containing the arbitration clause and "bound up" with the arbitrated dispute). Therefore, all claims against the network defendants stem from the cardholder agreements issued by the bank defendants.

In sum, arbitrating cardholder claims against the network defendants are intertwined with the issuing banks. For that reason, arbitrating cardholders are estopped from avoiding arbitration with network defendants.

### 2. *Non–Signatory Bank Defendants*

██ *JLM* also leads this Court to conclude that plaintiffs having enforceable arbitration agreements with their respective issuing banks cannot avoid arbitration with the non-signatory banks. This is because: (1) plaintiffs allege a "close relationship" between the banks through their common control of the network associations; (2) plaintiffs' antitrust claims against their non-signatory banks "concern[ ] that rela-

tionship"; and (3) plaintiffs' antitrust claims against the non-signatory banks are "closely linked" to their claims against their issuing banks. *See JLM*, 387 F.3d at 178 n. 7.

The relationships among the bank defendants is different than the bank defendants' relationships with the network defendants. While the issuing banks pervade the network associations, they are vigorous competitors in the market. However, estoppel merely requires a close business relationship between the signatory and non-signatory, independent of their alleged conspiracy. *JLM*, 387 F.3d at 178 n. 7 (citing *Choctaw*, 271 F.3d at 403; *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 948 (11th Cir. 1999)); *Astra Oil*, 344 F.3d at 281; *see Camferdam*, 2004 WL 307292, at *6. Such a "close relationship" is asserted here.

The Complaint alleges that the issuing banks operate collectively through the network associations and that this relationship incubated the conspiracy. *Cf. In re Managed Care Litig.*, 132 F.Supp.2d 989, 995 (S.D.Fla.2000) (finding "the requisite close relationship" to be lacking between competitors who were not alleged to be linked other than as co-conspirators). Plaintiffs allege that the issuing bank defendants were part of "a select group of member banks" that controlled the network defendants. (Compl. ¶ 89; *see* Compl. ¶¶ 72, 93.) The network associations are "created, owned, governed, and operated by and in the interests of their members." (Compl.¶ 88.) To this end, executives of the issuing banks interacted with each other closely on the network boards and committees. (Compl.¶ 34, 37, 89, 93–94.) In the same way that the issuing banks and the network defendants are closely aligned entities, the Complaint connects the bank defendants to each other through membership in the network

associations. *See JLM*, 387 F.3d at 178 n. 7 (finding a close relationship between signatory and non-signatory defendants who were alleged to be co-conspirators); *Astra Oil*, 344 F.3d at 281 (noting the "close corporate and operational relationship" between the signatory and the non-signatory seeking to compel arbitration).

Second, plaintiffs' antitrust claims stem from the banks' close relationship through the networks. The Complaint alleges that the bank defendants "jointly, *through their associations,* agreed to charge a floor price of 1% for the transaction fee charges denominated in a foreign currency." (Compl. ¶ 104 (emphasis added).) Indeed, according to plaintiffs, the banks' affiliation in the network associations fueled the alleged antitrust conspiracy: "The common control of VISA and MasterCard by the largest banks (including the Issuing Banks), and the common issuance of VISA and Master-Card cards by the largest banks, provided the vehicle for the inter-firm communications necessary to create, fix and maintain the currency conversion fee between them." (Compl.¶ 107.) Thus, plaintiffs maintain the networks "provide an organizational vehicle for widespread and wholesale violation of United States antitrust laws." (Compl.¶ 114.) In a nutshell, plaintiffs allege that all bank defendants conspired to fix the currency conversion fees through their common membership in the network associations. Just as in *JLM*, therefore, plaintiffs' claims that the non-signatory banks are jointly and severally liable with the issuing banks concerns the relationship between them. *JLM*, 387 F.3d at 178 n. 7.

Finally, plaintiffs' claims against the non-signatory bank defendants are "closely linked" to their claims against their issuing banks because both are intertwined with the cardholder agreements. Because plaintiffs allege that non-signatory banks

conspired with plaintiffs' issuing banks concerning the fees charged, those claims "arise under the 'subject matter' of the underlying agreement between plaintiffs and [the issuing banks]." *Currency Conversion I*, 265 F.Supp.2d at 403. Like *JLM*, plaintiffs allege that "all of the [defendants] conspired, each with the others, to inflate" the fees imposed under every cardholder agreement. *JLM*, 387 F.3d at 178 n. 7; *see Camferdam*, 2004 WL 307292, at *7 ("If this Court were to force the [non-signatories] to engage in litigation on the very same issues that will be arbitrated by the plaintiffs and the [signatories], 'the arbitration proceedings between the two signatories would be rendered meaningless and the federal policy in favor of arbitration effectively thwarted.'" (quoting *MS Dealer*, 177 F.3d at 947)).

Plaintiffs nonetheless contend that *JLM* is distinguishable on its facts from the present case because: (1) the *JLM* plaintiffs were sophisticated commercial enterprises; (2) the transactions were international where arbitration is particularly favored; and (3) each of the defendants in *JLM* had subsidiaries who signed arbitration agreements with the plaintiffs. (Pl. Recon. Mem. at 3–6.) However, the Second Circuit did not ground its analysis on any of these rationales. *See JLM*, 387 F.3d at 177–78. The Second Circuit's analysis turned on whether the issues regarding the non-signatories were "intertwined" with the contract through which the plaintiffs had agreed to arbitrate claims against their counter-signatories. *JLM*, 387 F.3d at 177.

Thus, on reconsideration, this Court modifies its October 15, 2004 ruling to hold that plaintiffs with valid arbitration agreements cannot avoid arbitration with the network defendants or the non-signatory bank defendants. Concomitantly, this Court modifies the damages and the in-

junctive relief classes to include only those cardholders who do not have enforceable arbitration agreements.

## C. *Motion for a Stay Pending Arbitration*

Defendants seek to stay claims of arbitrating cardholders pursuant to Section 3 of the FAA and this Court's inherent power to control its docket, *see WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 74 (2d Cir.1997).

 Section 3 of the FAA provides:
If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement. . . .

9 U.S.C. § 3. While the FAA speaks in terms of staying an entire action, it authorizes stays on a claim-by-claim basis. *See, e.g., McCowan v. Sears, Roebuck & Co.*, 908 F.2d 1099, 1107–08 (2d Cir.1990) (staying claims only against one defendant); *Currency Conversion I*, 265 F.Supp.2d at 416 (staying claims only against certain defendants); *Wright v. SFX Entm't Inc.*, No. 00 Civ. 5354(SAS), 2001 WL 103433, at *5–6 (S.D.N.Y. Feb.7, 2001) (same); *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 20, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) ("[T]he relevant federal law *requires* piecemeal resolution when necessary to give effect to an arbitration agreement." (emphasis in original)); *accord Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218–21, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985). More-

over, the FAA is mandatory and a district court man not decline to stay claims encompassed by Section 3. *Dean Witter,* 470 U.S. at 218, 105 S.Ct. 1238; *WorldCrisa,* 129 F.3d at 74.

The question now arises whether the FAA requires a stay of claims against non-signatory banks and networks that are arbitrable by estoppel. Plaintiffs argue that Section 3 is limited to arbitration obligations flowing from a written agreement. (Pl. Mem. at 3.) But here, plaintiffs have an enforceable written agreement containing an arbitration clause with their issuing bank, and that agreement is the predicate for arbitration by estoppel. *See Thomson–CSF,* 64 F.3d at 779 ("[T]he parties were estopped from avoiding arbitration because they had entered into written arbitration agreements, albeit with the affiliates of those parties asserting the arbitration and not the parties themselves."); *cf. In re Montauk Oil Transp. Corp.,* 859 F.Supp. 669, 677 (S.D.N.Y.1994) (denying motion to stay "because the party against whom the stay [was] sought ha[d] not agreed to arbitrate").

It would be incongruous to require arbitrating cardholders to arbitrate against all defendants without staying litigation of the arbitrable claims. Such a rule would undermine the "federal policy favoring arbitration" that the FAA seeks to promote. *See Moses H. Cone,* 460 U.S. at 24, 103 S.Ct. 927; *accord Oldroyd v. Elmira Sav. Bank,* 134 F.3d 72, 76 (2d Cir.1998).

The judicial gloss on FAA § 4 also illumines analysis of Section 3. Section 4 authorizes a party to move to compel another party "to arbitrate under a written agreement for arbitration." 9 U.S.C. § 4. The text of Section 4 parallels Section 3 in that the duty to arbitrate springs from a written agreement. Nevertheless, in the context of Section 4, courts routinely compel parties to arbitrate on the basis of estoppel even though one party was not a signatory

to the agreement. *See, e.g., JLM,* 387 F.3d at 178 & n. 7; *Astra Oil,* 344 F.3d at 281; *Choctaw,* 271 F.3d at 407–09; *Smith/Enron,* 198 F.3d at 98. In holding that arbitrating cardholders cannot avoid arbitration against non-signatories, this Court concludes that their claims are "referable to arbitration under an agreement in writing for such arbitration" within the meaning of 9 U.S.C. § 3.

This Court previously stayed claims by Bank One Delaware (f.k.a. First USA) and Bank of America cardholders against those issuing banks and their non-signatory corporate parents. *Currency Conversion I,* 265 F.Supp.2d at 416; *see also Currency Conversion II,* 224 F.R.D. at 570. For the same reasons, this Court stays claims by MBNA and Household cardholders against their issuing banks. So too, all arbitrating cardholders' claims against the non-signatory network and bank defendants are stayed because of the estoppel that arises from their written arbitration agreement with their issuing banks.

Finally, plaintiffs argue that the non-signatory defendants lack standing to stay this litigation under Section 3, even if arbitrating cardholders must arbitrate with them. (Pl. Mem. at 3.) Plaintiffs rely on two Second Circuit decisions holding that a Section 3 stay cannot be obtained by a nonparty to an arbitration agreement. *See Citrus Mktg. Bd. of Israel v. J. Lauritzen A/S,* 943 F.2d 220, 225 (2d Cir.1991) ("Lauritzen, a nonparty to the agreement herein that provided for arbitration, was not entitled to a section 3 stay."); *Nederlandse Erts–Tankersmaatschappij v. Isbrandtsen Co.,* 339 F.2d 440, 441 (2d Cir. 1964). These decisions are distinguishable because those plaintiffs did not face estoppel and therefore were free to litigate against the non-signatories. *See, e.g., Nederlandse,* 339 F.2d at 441 ("Defendants are not parties to the arbitration agree-

ment. The issues of the present action are not referable to arbitration between the parties."). Said differently, in *Citrus Marketing* and *Nederlandse,* the non-signatories lacked any standing to enforce arbitration. *See Citrus Marketing,* 943 F.2d at 225; *Nederlandse,* 339 F.2d at 441. By contrast, defendants in this litigation move for a stay because they are entitled to mandatory arbitration pursuant to the estoppel doctrine.[12] Thus, the rationale of *Citrus Marketing* and *Nederlandse* is inapposite, and defendants have standing to seek a Section 3 stay against the arbitrating cardholders. *See Camferdam,* 2004 WL 307292, at *7 (granting non-signatories' motion for a stay pending arbitration on the basis of estoppel); *Currency Conversion I,* 265 F.Supp.2d at 416 (same); *Fluor Daniel,* 1999 WL 637236, at *8–9 (same).

Accordingly, this Court grants defendants' motion to stay the claims of arbitrating cardholders against all defendants, because those claims "are referable to arbitration" under plaintiffs' cardholder agreements and through the estoppel doctrine. *See* 9 U.S.C. § 3.

### CONCLUSION

For the foregoing reasons, defendants' motions are granted in part and denied in part. In sum, this Court holds that arbitration clauses engrafted by defendants Chase and Citibank on cardholder agreements after this litigation commenced are not enforceable. Conversely, arbitration agreements entered into before this litigation are enforceable against the cardholders by the signatories, network defendants and the non-signatory banks.

This Court modifies the damages class, divided into two subclasses as follows:

a) All Chase and Citibank cardholders of MasterCard-branded general purpose cards without enforceable arbitration clauses who were assessed a foreign transaction fee or surcharge for using such cards to purchase goods and/or services in foreign currencies ("MasterCard Subclass"); and

b) All Chase and Citibank cardholders of VISA-branded general purpose cards without enforceable arbitration clauses who were assessed a foreign transaction fee or surcharge for using such cards to purchase goods and/or services in foreign currencies ("VISA Subclass").

This Court certifies an antitrust injunctive relief class consisting of all Chase and Citibank cardholders of VISA- and MasterCard-branded general purpose cards without enforceable arbitration clauses.

Finally, this Court certifies a TILA class consisting of cardholders of VISA- and MasterCard-branded general purpose cards, divided into two subclasses as follows:

a) All Chase cardholders without enforceable arbitration clauses ("Chase TILA Subclass"); and

b) All Citibank cardholders without enforceable arbitration clauses ("Citibank TILA Subclass").

---

**12.** There is some discrepancy concerning which defendants are moving for the stay. Defendants' motion purports to be filed on behalf of all defendants (Def. Mem. at 1), but then asserts that the stay is sought only by the issuing banks. (Def. Mem. at 7–8). Because the motion is filed and signed by all defendants, this Court deems all defendants to be movants. *See* Fed.R.Civ.P. 11.